### CITY OF CORPUS CHRISTI et al., Appellants,

v.

### NUECES COUNTY WATER CONTROL AND IMPROVEMENT DISTRICT NO. 3 et al., Appellees.

#### No. 977.

Court of Civil Appeals of Texas, Corpus Christi.

June 30, 1976.

Rehearing Denied Aug. 30, 1976.

James F. McKibben, Asst. City Atty., Corpus Christi, Frank R. Booth, Austin, Allen Wood, Wood, Burney, Nesbitt & Ryan, Corpus Christi, for appellants.

Roger Butler, Corpus Christi, Victor W. Bouldin, Vinson, Elkins, Searls, Connally & Smith, Houston, for appellees.

## OPINION

NYE, Chief Justice.

This is a suit for declaratory judgment brought by the plaintiffs for construction of the various water rights of the parties. The City of Corpus Christi and the Lower Nueces River Water Supply District as plaintiffs sued the Nueces County Water Control and Improvement District No. 3 as defendant to adjudicate the relative rights, priorities and values claimed by the parties.

Trial was before a jury which was ultimately dismissed prior to the entry of judgment by the trial court. All parties appealed from the entry of judgment.

The suit was originally filed in April of 1964. The controversy relates to certain water rights claimed by the parties to divert water from the Nueces River near Calallen, Texas. The City and the Lower Nueces River Water Supply District (hereinafter called Supply District) appeal complaining principally of that part of the judgment which authorizes the board of directors of the Nueces County Water Control and Improvement District No. 3 (hereinafter called Robstown District) to change the use of the water appropriated for irrigation purposes to a superior use of domestic and municipal purposes when in the opinion of the Board of the Robstown District the welfare of the District may require. The City and the Supply District also appeal from that portion of the judgment which assigns a specific quantity of water to the Robstown District's water rights under C.F. 70. The City further appeals from that part of the judgment which limits the City's water rights under C.F. 64 and which authorizes the Robstown District to divert water from a certain natural enlargement occurring in the Nueces River. The Robstown District by cross-point complains of the trial court's judgment that assigned a superior priority to the City's water rights (C.F. 64) over their prior water right (C.F. 70).

The Robstown District (defendant appellee) is a conservation and reclamation district which owns and operates a water supply and irrigation system. This system furnishes all of the water to the City of Robstown in Nueces County and also a supply of water for irrigation of the surrounding land. The Robstown District claims the right to take water from the Nueces River under certified filing 70 and Permit No. 529. The Robstown District's diversion facilities are located in a natural pool in the Nueces River in Nueces County approximately one mile upstream from where the City's diversion facilities are located. The City obtains water pursuant to Certified Filing 64 and Permit No. 51.

Because this case involves appropriative rights under Certified Filings and Permits, a brief history of this system of appropriation will be helpful. The appropriative system was imported into Texas by the 1889 Irrigation Act (Acts 1889, 21st Leg., p. 100, Ch. 88, Gammel, Laws of Texas 1128). This Act provided that an appropriator could acquire a water right and fix a priority by diverting water from a stream, putting it to a beneficial use and by then filing with the County Clerk an affidavit and map depicting the diversion works and describing the proposed use.

In 1895, the Legislature rewrote the appropriation law (Acts 1895, 24th Leg., p. 21, Ch. 21, 10 Gammel, Laws of Texas 751 and divided the public waters of the state into "ordinary flow and underflow" on the one hand, and storm or rain waters on the other. It also carried forward the 1889 provisions which required the filing of a map and affidavit of use by the appropriator. The Act also specified the items to be included in the sworn statement filed for record with the County Clerk. It required that the affidavit should show the approximate number of acres to be irrigated, the name of the ditch or canal, its size, capacity and location, the name of the appropriator, and the name of the stream from which water was to be taken. A map showing the route of the ditch or canal was to be attached to the affidavit. Upon filing with the County Clerk, the appropriator was required to proceed with diligence in the construction of his proposed works. Completion of the

water works, following the filing with the County Clerk, constituted the perfection of the water right. In other words, the project was completed and a water right was perfected by the taking of the water into the system and conveying it through the canal as shown on the map to the place of intended use described in the sworn statement.

In 1913, the Legislature adopted the Burges-Glasscock Act (Acts 1913, 33rd Leg., p. 358, Ch. 171, 16 Gammel, Laws of Texas 358) which had state wide application. All waters in Texas streams to which prior rights had not attached were declared to be the property of the State of Texas. A Board of Water Engineers (the predecessor agency to the present Texas Water Rights Commission) was created. The 1913 Act gave rise to the term "Certified Filing" (C.F.). It required the County Clerk of the respective counties to prepare certified copies of all instruments that were on file in his office relating to the appropriation of public waters and forward them to the office of the Board of Water Engineers, where they were filed and serially numbered.

The 1913 Act introduced the "Permit System" which was placed under the control of the Board of Water Engineers. The County Clerk's filing procedure was then superseded and an application to the Board of Water Engineers for a "permit" to appropriate water was substituted therefor. In the case at bar, appropriative rights are involved, these being mainly C.F. 64 and Permit No. 51 belonging to the City and C.F. 70 and Permit 529 belonging to the District.

The City of Corpus Christi began using the Nueces River as a municipal water supply in 1892 or 1893. In 1892, the City entered into a contract with Jaeger and McMullen whereby they agreed to construct

a complete system of water works for the City. In September, 1892, Jaeger and McMullen assigned the contract to the Corpus Christi Water Supply Company. On October 8, 1892, the City acquired a one acre tract on the Nueces River near Calallen, on which was to be built a diversion plant.

In 1892, a sack dam was built across the Nueces River near Calallen, Texas, to stop the intrusion of salt water up the river. In 1895, the 24th Legislature enacted House Bill 740 authorizing the Corpus Christi Water Supply Company to construct a dam to be substituted for the old sack dam across the Nueces River. The purpose of constructing the dam was to keep the salt water of the Nueces Bay from contaminating the sweet or fresh water of the Nueces River upstream from that point. The dam was located a short distance downstream from the City's pumping plant. The height of the dam as constructed was approximately eighteen (18) inches above mean sea level. The "reservoir" (being that water contained upstream from the dam in the 10½ mile enlargement) as was then created had a storage capacity of 928 acre-feet [1] and a dependable yield [2] of 4.4 C.F.S. [3]

On February 1, 1910, this water supply system was purchased by and conveyed to the City. On December 26, 1913, the City filed with the County Clerk of Nueces County, a statement in conformity with the 1913 statute detailing its water works system. This sworn statement will hereinafter be referred to as certified filing 64. The statements made by the City which are contained in C.F. 64, are quite lengthy. They may be summarized as follows: 1) the City has, for the past twenty years, been the owner of a pumping plant and water works system whereby certain waters of Nueces River are diverted and pumped through a pipeline to the City of Corpus

1. ACRE–FOOT: The quantity of water that would cover one acre to a depth of one foot. An acre-foot is equal to 325,851 gallons.

2. DEPENDABLE YIELD: The amount of water that a reservoir will provide on a dependable basis, even during a drouth period.

3. C.F.S.: Cubic foot or cubic feet per second. A flow of 10 C.F.S. means that ten cubic feet of water flows by a point in the stream each second. One C.F.S. yields 1.98 acre-feet per 24-hour period, or 722.70 acre-feet per year.

Christi; 2) the pumping plant is situated in Nueces County, Texas, on a one-acre tract owned by the City, fronting on the Nueces River at the town of Calallen; 3) the capacity of the present pipeline is 0.93 cubic feet per second; 4) between the Nueces Bay and a point at which the pump is situated, a dam was constructed of loose rock; 5) this dam serves to keep back the salt waters of the Nueces Bay; 6) at and above the point where the water is diverted is a natural enlargement and deepening in the Nueces River, ten and one-half miles long by about eighty feet in average width; 7) said portion of the river has a holding capacity of 40,400,000 cubic feet (928 acre-feet).

The certified filing (C.F. 64 above) and the permits ultimately obtained and held by the City which are material to the rulings of the trial court and to the questions before us include:

1) *C.F. 64* : The City is authorized to divert and use for municipal purposes water not to exceed 675 acre-feet per annum of the natural flow of the waters of Nueces River and waters occurring in the 10½ mile natural enlargement and deepening of the river above Calallen, Texas, at a maximum diversion rate of 0.93 c.f.s. and with a priority date of 1895. (In this case, the City claims the diversion rate should be 4.4 c.f.s. The Robstown District claims the priority date should be 1913.)

2) *Permit No. 51* was granted to the City on February 19, 1915, which authorizes the City to pump, divert and use from the water impounded and sweetened in the bed of the Nueces River in what is known as the 10½ mile enlargement above the dam and from the normal flow not to exceed 4,054 acre-feet of water per annum at a maximum rate of diversion of 5.6 cubic feet per second of time and with a priority date of May 4, 1914.

3) *Permit No. 933* was granted to the City in 1927 which authorized the City to appropriate and impound 500,000 acre-feet of water from the Nueces River by constructing a dam. A dam was constructed in 1934 at Mathis, Texas, providing for storage of only 60,000 acre-feet of water.

4) *Permit 1177* was granted to the City on October 30, 1931 which authorized a dam at Calallen to be reconstructed and raised to a height of 3.5 feet above high tide.

5) *Permit 1463* was issued on August 19, 1948, amending Permit 933 and providing for specific allocation of 500,000 acre-feet of water.

6) *Permit 1656* was issued to the City on January 20, 1953, authorizing the City to build a dam a short distance downstream from the "Old Mathis Dam" and to create a reservoir with maximum capacity of 300,000 acre-feet and inundating the dam and reservoir created under Permit 933.

The Robstown District has only two water rights, one of which was derived from its predecessor. The record shows that on February 17, 1909, Mr. J. W. Fryckberg filed for record what will be hereinafter referred to as Certified Filing No. 70. Such filing was for the purpose of acquiring the right to appropriate for irrigation purposes, the unappropriated waters of the ordinary flow of the Nueces River. The land to be irrigated comprised approximately 3,700 acres. On July 27, 1909, C.F. 70 was supplemented by adding 603.1 acres to the original acres to be irrigated, making a total of 4,303.1 acres under C.F. 70. On July 22, 1909, Mr. Fryckberg conveyed his rights under C.F. 70 to a corporation known as the Nueces River Irrigation Company. The Robstown District became successor to the water rights held by Fryckberg and the Nueces River Irrigation Company.

On April 30, 1921, Permit No. 529 was issued to the Robstown District authorizing said district to divert and appropriate from the ordinary and storm and flood flow of the Nueces River not to exceed 2,774 acre-feet of water per annum to irrigate 1109.5 acres, and to provide a supply of water for the town of Robstown, Texas, not to exceed 166 acre-feet of water per annum. The rate of diversion under Permit 529 was not to exceed 15 cubic feet per second.

Since 1921, the Robstown District has been diverting water from the Nueces River. This has been the only source of water

for the City of Robstown. The Robstown District supplies water to farms within its boundaries for irrigation purposes. As Robstown's population increased (its population now about 21,000), its urban area also increased to the extent that it began occupying farm lands which were formerly supplied irrigation water by the Robstown District.

The 166 acre-feet of water for municipal purposes mentioned in Permit No. 529 soon became inadequate to supply Robstown. The records show that in every year since 1924, the Robstown District used more water than the 166 acre-feet per annum authorized for municipal purposes. Each yearly water service report showed a steady increase in annual quantities of water used for municipal purposes so that by the year 1973, 2119 acre-feet of water was used to keep up with the growth of Robstown. These increases were all reported to the Texas Water Rights Commission.

In 1964, the City filed this suit for a declaratory judgment seeking to determine its and the Supply District's rights in the Nueces River. As part of this suit, the City sought a recovery of $218,143.51 from the Robstown District for allegedly illegal and improper appropriation of water in the past, and for an amount in excess of $22,-000.00 per year for each year after 1965. The plaintiff City, among its allegations, asserted in effect that: 1) it is entitled to all of the flow out of the 10½ mile enlargement of the Nueces River (4.4 C.F.S.), and to such increase in its appropriation as any comparably growing city would need for its inhabitants; 2) that Robstown District's rights under C.F. 70 are either partially or fully abandoned; 3) that absent approval by the State Board of Water Engineers for a transfer of water use from irrigation purposes to municipal use by the City of Robstown, the withdrawal of water for municipal purpose in excess of 166 acre-feet per annum was unlawful; 4) that the rights which the Robstown District have under C.F. 70, if any, are only to so much water as is needed for irrigation of the land described in said C.F. 70; and 5) that the excessive

withdrawals by the Robstown District and any change of use from irrigation to municipal and industrial use are prejudicial to the City of Corpus Christi and should be prohibited.

The Robstown District answered such allegations asserting, among other things, that the question of whether the District has the authority under C.F. 70 to withdraw water from an inferior use of irrigation and to appropriate such water to a superior use of municipal and domestic purposes, has already been adjudicated and determined in its favor by the Texas Courts and, therefore, it is res judicata as to the City; and that the City is barred from asserting its various other claims against the Robstown District's water rights under the Doctrine of Laches, stale demand and estoppel.

Before the case at bar went to trial, the Texas Water Rights Commission, on December 1, 1965, commenced a proceeding in Travis County against the City of Corpus Christi and the Robstown District ostensibly to cancel any unused portion of the City's claimed rights under C.F. No. 64 and Permit No. 51 and the Robstown District's claimed rights under C.F. 70 and Permit No. 529. The Commission, after hearing evidence, entered an order ostensibly cancelling in part the City's C.F. 64 and partially cancelling the Robstown District's claimed rights under C.F. 70 and Permit No. 529.

The Robstown District then brought suit in the District Court of Travis County in a trial de novo to set aside and modify the order of the Commission. The City intervened as a defendant in the suit denying all the allegations in the Robstown District's petition and praying that the Robstown District take nothing. The District Court entered judgments sustaining the orders of the Water Rights Commission.

The Robstown District then appealed to the Austin Court of Civil Appeals asserting first that the Commission in its purported partial forfeiture of the City's C.F. 64, actually enlarged and upgraded C.F. 64, and in a second appeal, the Robstown District asserted that the District Court (which af-

firmed the Commission's action) was in error in refusing to permit the Robstown District to change the use of irrigation waters under its C.F. 70 to municipal and domestic purposes. The City of Corpus Christi joined with the Texas Water Rights Commission in contesting the Robstown District's two appeals.

In light of this litigation, the City of Corpus Christi on April 14, 1971, in the case at bar, filed a motion for continuance stating among its grounds that the decision in the two Travis County cases should determine "most of the issues involved in the case at bar" and it should, therefore, be continued pending the outcome of the Travis County litigation. On April 16, 1971, the city's motion was granted, continuing this case until the Austin Court of Civil Appeals had decided its case.

On May 17, 1972, the Austin Court of Civil Appeals reversed and rendered the Judgment of the District Court in two separate opinions both styled *Nueces County Water Control and Improvement District No. 3 v. Texas Water Rights Commission*, one being 481 S.W.2d 924 (Tex.Civ.App.—Austin 1972, writ ref'd n. r. e.) and the other 481 S.W.2d 930 (Tex.Civ.App.—Austin 1972, writ ref'd n. r. e.). In the 924 case, the Austin Court reversed the District Court's judgment and rendered judgment that the order of the Commission insofar as it relates to certified filing No. 64 was incorrect and was, therefore, set aside. In the case on page 930, the Austin Court held that the Robstown District was authorized to change the use of irrigation water under C.F. 70 to municipal and domestic purposes as conditions change and as the need of the people for the one use decreases and the need for the other use increases, without being required to obtain an amendment to C.F. 70.

Subsequent to and in light of the Austin Court's judgment, the Nueces County case proceeded to trial on April 23, 1974. However, the City took a non-suit on its claim for monetary damages immediately preceding the trial.

At the conclusion of the trial and after all the evidence had been heard, the trial judge removed the case from the jury and entered judgment as follows:

1) that the City of Corpus Christi is authorized under C.F. 64 to divert for municipal purposes, not to exceed 675 acre-feet per annum of natural flow of the Nueces River and waters occurring in the 10½ mile natural enlargement, at a maximum rate of 0.93 c.f.s., (*we affirm this portion of the judgment*); and with a priority date of 1895, (*we reverse and render this portion of the judgment setting the priority date at December 26, 1913*);

2) that the Robstown District is authorized under C.F. 70 to divert, not to exceed 45.4 c.f.s. of the natural flow of the waters of the Nueces River and the waters occurring in the 10½ mile natural enlargement for the irrigation of not to exceed 4,303.1 acres of land with a priority date as to 3,700 acres of land of February 7, 1909, and as to 603.1 acres of land of July 27, 1909, (*we affirm this portion of the judgment*); provided that the annual diversion shall not exceed 2½ acre-feet per acre per annum of the lands described in C.F. 70, (*we reverse and remand this portion of the judgment*);

3) that the City of Corpus Christi is authorized by Permit No. 51 to divert from the water impounded and sweetened in the bed of the Nueces River in what is known as the 10½ mile enlargement above the dam and from the normal flow not to exceed 4,054 acre-feet of water per annum at a maximum rate of diversion of 5.6 c.f.s. and with a priority date of May 4, 1914, (*we affirm this portion of the judgment*);

4) the Robstown District is authorized under Permit No. 529 to divert, not to exceed 2,774 acre-feet of the ordinary storm and flood flow waters of the Nueces River at the District's pumping plant located at river mile 14 which is within the 10½ mile enlargement, for the irrigation of 1,109.5 acres of land and not to exceed 166 acre-feet per annum for water supply for the inhabitants of Robstown, with a maximum diversion rate of 15 c.f.s. of time, (*we affirm this portion of the judgment*); that

the water diverted for irrigation shall not exceed 2½ acre feet per acre per annum, (*we correct this portion of the judgment to read not to exceed a total of 2774 acre feet per annum*); and with a priority date of January 28, 1921, (*we affirm this portion of the judgment*);

5) that the City of Corpus Christi has a right to maintain a dam at river mile 13 on the Nueces River near Calallen, Texas, constructed in accordance with H. B. 740, Acts 24th Legislature, 1895, Ch. 4, p. 922 (10 H. Gammel, Laws of Texas 922) as supplemented by the authority granted under Permits Nos. 51 and 1177 issued by the State Board of Water Engineers of Texas, said dam having a maximum crest of 3½ feet above high tide, thus creating a reservoir having a total storage capacity of 1175.18 acre-feet of water, (*we affirm this portion of the judgment*);

6) that the City of Corpus Christi is authorized by Permit No. 933, as amended by Permits Nos. 1463 and 2026, to divert and use not to exceed 60,000 acre-feet of water per annum for the respective purposes set forth in said permit with a priority date of January 15, 1925, (*we affirm this portion of the judgment*);

7) the Supply District is authorized by Permit No. 1656 to construct and maintain a dam at river mile 48 on the Nueces River near Mathis and create a reservoir having a storage capacity of 300,000 acre-feet and to impound therein, not to exceed 300,000 acre-feet of the waters of the Nueces River without any right on the part of the Robstown District to divert and use such water. The priority date of Permit No. 1656 is September 15, 1952, (*we affirm this portion of the judgment*); the City is authorized by Permit No. 1656 and Permit No. 933, to divert and use out of the waters impounded in said 300,000 acre feet reservoir not to exceed 300,000 acre-feet of water per annum for the purpose set forth in Permit No. 933 as amended by Permits Nos. 1463 and 2026 (*we affirm this portion of the judgment*);

8) each of the foregoing water rights is subordinate and inferior to each other such right, if any, having an earlier priority date, (*we affirm this portion of the judgment*);

9) that the Robstown District has no rights in any of the waters lawfully impounded in Lake Corpus Christi or in any waters artificially impounded above sea level in the Calallen reservoir but the Robstown District and the City are entitled to divert and use, in order of their respective priorities, the natural flow of the Nueces River at their respective pumping plants near Calallen and the waters occurring below sea level in the 10½ mile natural enlargement above the Calallen salt water barrier dam (*we affirm this portion of the judgment*);

10) that the City and the Supply District are required to permit to flow through Lake Corpus Christi dam and reservoir such of the flow of the Nueces River as is necessary to satisfy the prior downstream water rights of the Robstown District and the City, but the City and the Supply District are authorized to impound and use all water flowing into such reservoir which exceeds the prior diversion rights of the City and the Robstown District; (*we affirm this portion of the judgment*);

11) the Board of Directors of the Robstown District is authorized to change the use of its waters appropriated for irrigation purposes to the superior uses of domestic and municipal purposes when, in the opinion of the Board, the welfare of the district may require, (*we affirm this portion of the judgment subject to a determination of the quantity of water if the change is made under C.F. 70*).

## RES JUDICATA AS TO CHANGE IN USE

The record before us is voluminous. The City and the Supply District bring forward on appeal some 64 points of error, some of which we have conveniently grouped together for a more orderly review. The Robstown District has two cross-points of appeal. In appellants' points of error 1, 2, 32–41, they assert that the trial judge erred in sustaining the Robstown District's plea

of res judicata relating to the Robstown District's right to change the use of water from irrigation to municipal use, and in failing to hold that even if the change was permissible, that water could be used for municipal purposes only at such times and in such amounts as the Robstown District could show that such water was then necessary for irrigation.

The trial court held that the Board of Directors of the Robstown District is authorized to change the use of its waters appropriated for irrigation purposes to the superior uses of domestic and municipal purposes when, in the opinion of the Board, the welfare of the District may require.

As set out previously, the Texas Water Rights Commission had attempted to forfeit that portion of Certified Filing No. 70 which had been converted from irrigation to municipal and domestic uses, and to foreclose the District's right to continue to convert water from irrigation to municipal and domestic uses as the need for irrigation declined and the need for municipal and domestic uses increased. The trial court sustained the Commission's order and concluded as a matter of law that the District could not change the purpose of use of any water under C.F. 70 until it had applied for and obtained from the Commission an amendment authorizing such change. The Commission contended that absent an amendment to C.F. 70, as irrigation is reduced by urban expansion, the water right is lost to that extent. Underlying the City's interest in that proceeding, was its claim in the case at bar, that the District should be required to pay the City for all water used by the District for municipal and domestic purposes in excess of the 166 acre feet per annum which is authorized by Permit 529. The case was then appealed to the Austin Court of Civil Appeals and docketed under two causes.

The Austin Court of Civil Appeals held (in 481 S.W.2d 930, supra) that the Robstown District was authorized, under the circumstances to change the use of irrigation waters under its certified filing No. 70 to municipal and domestic purposes as con-

ditions change without filing an amendment to its certified filing or obtaining the approval of the Texas Water Rights Commission.

The Robstown District herein asserts that to the extent that the Austin Court of Civil Appeals has ruled that the District could change the use of irrigation waters under its C.F. 70 to municipal and domestic purposes as conditions change, such judgment is, therefore, res judicata in the present suit. We agree.

■■■ The latin phrase "res judicata" means that the matter has been adjudicated, determined and settled by judgment. *Abbott Laboratories v. Gravis*, 470 S.W.2d 639 (Tex.Sup.1971). This Court has held on several occasions that the doctrine of res judicata operates to preclude a litigant from relitigating an issue which has been previously raised or could have been raised and decided against it.

"The general principle, announced in numerous cases, is that a right, question, or fact, distinctly put in issue and directly determined by a court of competent jurisdiction as a ground of recovery or defense cannot be disputed in a subsequent suit between the same parties *or their privies,* or with another so identified in interest with such person that he represents the same legal right, the same question, the same particular controversy or issue which has been necessarily tried and finally determined upon its merits by a court of competent jurisdiction in a judgment in personam in a former suit."

*Marange v. Marshall*, 402 S.W.2d 236 (Tex. Civ.App.—Corpus Christi 1966, writ ref'd n. r. e.). See authorities cited therein and also see *State v. Superior Oil Company*, 526 S.W.2d 581 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd n. r. e.). There is no question that the parties involved in this case are the same parties representing the same legal rights, questions, and controversies that have been determined in another court of competent jurisdiction.

■■■ The City in attempting to circumvent the bar of res judicata brings forward a rather novel argument. The City con-

tends that it is the Austin Court of Civil Appeals' mandate, not its opinion that constitutes the Court's judgment. Although the Austin Court in its Opinion held that the District had the right to convert its water use under C.F. 70 from irrigation to municipal purposes, the Austin Court's mandate merely reversed the judgment of the trial court and rendered judgment that the Commission's order of February 7, 1968, be set aside and held for naught. The City asserts that in determining the question of res judicata, the mandate must be looked at and in the absence of language in the mandate showing that such issue was tried, the City was not barred from requesting a determination of such issue. We do not agree.

■ We hold that the Robstown District has the right to change the use of the irrigation waters to municipal or domestic purposes (a higher use) when in the opinion of the Board of Directors of the Robstown District, it determines that the welfare of the District may require. This question has already been litigated. Even if res judicata was not applicable, we would affirm the trial court's judgment for the same reasons announced by the Austin Court of Civil Appeals in their Opinion. (481 S.W.2d 930, supra.) This authorized change of use under Permit No. 529 will be to the extent of 2774 acre-feet per annum.[4] Under C.F. 70, the Robstown District may change the use of this water to the extent (quantity) that will be determined on remand as we hereinafter so hold.

### THE 2½ ACRE–FEET LIMITATION UNDER C.F. 70

■ The City in its points of error 33 and 37 asserts that the trial court erred in holding that the Robstown District was entitled to divert for municipal purposes 2½ acre-feet per annum for each acre described in C.F. 70 and Permit 529.

Permit 529 authorized the District to use 2774 acre-feet of water to irrigate 1109.5 acres of land. As we have heretofore held, this water may be converted to a higher use to the extent of the water right owned by the District, (2774 acre-feet per annum).

With reference to the 2½ acre-feet per annum for the lands described in C.F. 70, we have an altogether different problem. After 1913 when the Legislature established the "Water Act", permits were granted for the use of water. With these permits, specific limitations on the quantity of water were generally assigned along with the permit to irrigate a certain quantity of land. This was not so on prior appropriative rights emanating from "certified filings". There, the appropriator was permitted to irrigate a certain number of acres. With this right, the owner could use all of the water that could be beneficially used without waste and no more.

Under C.F. 70, the Robstown District was authorized to irrigate 4,303.1 acres of land. No specific amount of water was assigned to this water right. The trial judge in its judgment arbitrarily assigned 2½ acre-feet for a total of 10,557.75 acre-feet of water. This holding by the trial court is unsupported by law and is not supported by any evidence.

As we have hereinbefore held, the Robstown District may convert all or a part of its water rights under C.F. 70 to municipal uses (a higher use). The problem then is how much water goes with the assigned use?

The Robstown District contends that it is entitled to the 2½ acre-feet times 4,303.1 under C.F. 70 and 2774 acre-feet under Permit 529, for a total of 13,531.75 acre-feet of water per annum. This, they say, can be converted to domestic or municipal use whenever, in the opinion of the Board, such is required.

4. The trial court's judgment authorizing water to be diverted for irrigation on the 1109.5 acres in Permit 529 *not to exceed 2½ acre-feet per annum*. This is error. The judgment should read "not to exceed a total of *2774 acre-feet per annum*." Although this is about the same amount of water, the permit authorizes 2774 acre-feet per annum not 2½ acre-feet per acre per annum. The judgment is accordingly corrected. Rule 434, T.R.C.P.

The City asserts that even if the Robstown District has the right to change its use of irrigation water to either domestic or municipal purposes, the Robstown District is limited to conversion of only that water which is needed for irrigation and not that assigned by the trial court. The City would suggest that the necessary amount of water to irrigate the 4,303.1 acres can be fairly estimated. The City indicates that such estimated amounts would have to be determined each year of use. We believe that this method of determining the quantity of water converted to the higher use is unsound as it could cause prolonged and repeated litigation.

■ The water right owned by the Robstown District, envisions the use of such water, for the irrigation of land, that can be applied to the land for its benefit, without committing waste. Although this amount would vary from year to year, a factual determination can be determined. We believe that such should be determined at the time the Robstown District converts a specific number of acres to the changed use herein authorized.

The District's record of water use for a 50 year period is relevant, but not conclusive. 1923 to 1973, the maximum amount of water ever used in any one year for irrigation was 4,157 acre-feet (1925). In 1972, for instance, the District only used 87 acre-feet for irrigation. The District admits that the average diversion of water by the District for a 10 year period next preceding the year of trial was 2,598 acre-feet.

The amount of water that can be beneficially used varies tremendously throughout the State of Texas. For instance, it might take 9 acre-feet of water to irrigate each acre of a golf course in a given year. In arid porous sandy land as much as 6 acre-feet per acre per year could be put to beneficial use. The irrigation of rice land calls for great quantities of water, some of which is returned to the rivers as surplus. Even though this Court affirmed a trial court's judgment that 2½ acre-feet was the maximum beneficial use for the water in the "Valley Water case", *State v. Hidalgo*

*County Water Control & Improvement District No. 18,* 443 S.W.2d 728 (Tex.Civ.App.—Corpus Christi 1969, writ ref'd n. r. e.), that case was different from the case at bar. There, there was evidence (annual rainfall, the particular type of land being used, etc.) that supported the trial court's judgment.

We, therefore, hold that the trial court was in error in assigning 2½ acre-feet per acre per annum to C.F. 70. Mr. Justice Pope in *Texas Water Rights Commission v. Wright,* 464 S.W.2d 642 (Tex.Sup.1971) said:

"Inherently attached to a permit to appropriate waters, therefore, is the duty that the appropriator will beneficially use the water. The State, in administering its water resources, is under a constitutional duty to conserve water as a precious resource and that duty is also inherent in the grant of a water permit."

■ Article 5.025, our Water Laws, state: "Scope of Appropriative Right

A right to use state water under a permit or a certified filing is limited not only to the amount specifically appropriated but also to the amount which is being or can be beneficially used for the purposes specified in the appropriation, and all water not so used is considered not appropriated."

The determination of the amount of water to be assigned to each acre of land that is to be converted to a higher use is a fact issue. We, therefore, reverse that portion of the trial court's judgment severing it from the balance of the judgment here before us and remanding such severed issue to the trial court for a new trial, in accordance with this opinion. Rule 434, T.R.C.P.

## RESERVOIR

■ The Nueces River is one of the great rivers in Texas. Several rivers and numerous tributaries flow into it along the route from its source in the Edwards Plateau to where it empties into the Nueces Bay at Corpus Christi. As so many rivers do before they reach the sea, they deposit delta soil along their banks and take on a snake-like shape while winding toward the sea.

From the mouth of the Nueces River in Nueces Bay upstream, the beds and bottoms of the river are below sea level for approximately 24 miles. In the early 1890's, a sack dam was built about 13 miles upstream from the mouth of the river at a place called Calallen. From the sack dam upstream for an additional 10½ miles, the bottom of the river varied from approximately 15 feet below sea level to sea level. Upstream from the sack dam to the point of sea level, (10½ miles) is a natural enlargement of the river. The river averages eighty (80) feet in width and within this enlargement, there is confined 928 acre-feet of water. When the dam was erected, it trapped water on both sides of it. If the river would maintain its crest at exactly sea level, the hydrostatic pressure would presumably be the same on either side of the dam. To protect the trapped waters upstream from an invasion of salt water from very high tides, the height of the dam was gradually increased to 3½ feet above sea level. The water thus trapped in the natural enlargement, sweeten and eventually became suitable for human consumption.

The City claims that the dam created a reservoir and all of the water behind the reservoir belongs to the City because its predecessor built the dam. A dam is a barrier which prevents the flow of water; it is a barrier built across a watercourse; it is a barrier that checks the flow of water; in other words, a body of water is confined by a dam. See Webster's Dictionary, 7th Edition. A dam may, but does not necessarily, create a reservoir that stores water.

The Calallen Dam when erected to the height of sea level did not create a storage facility. It only trapped the water that was behind it (figured 928 acre-feet). That portion of the dam above sea level not only trapped the water up to the point of sea level, but it actually created a reservoir for storage, from sea level to 3½ feet (figured 247.18 acre-feet). This is the present height of the dam (total water upstream from the dam in the natural enlargement, is 1175.18 acre-feet). The trial court did not award any of the trapped waters above sea level in

this natural enlargement to the Robstown District, nor does such District claim any of such water.

In the City's points of error Nos. 3–30, they assert that the trial court erred in limiting the City's rights under C.F. 64 to a diversion rate of 0.93 c.f.s. and in failing to hold that the City was entitled to use all of the dependable yield (4.4 c.f.s.) of the reservoir. The City generally asserts that the trial court erred in holding there was no storage in the river at Calallen and erred in holding that the Robstown District was entitled to appropriate any water out of the 10½ mile natural enlargement behind the dam.

The first question to be decided is whether the trial court erred in limiting the City's rights under C.F. 64 to a diversion rate of 0.93 c.f.s. The trial judge found the following facts:

1) The dam constructed on the Nueces River near Calallen on or about 1893 provided a reservoir that contained water suitable for domestic use.

2) The purpose of constructing a dam at Calallen was to provide a water supply for the City of Corpus Christi.

3) The City of Corpus Christi had used water from the reservoir at Calallen for a water supply continuously from 1893 to the present time.

4) The dependable yield of the reservoir at Calallen after the construction of the dam was 4.4 c.f.s.

C.F. 64, filed by the City of Corpus Christi on December 26, 1913, perfected the City's water right. The statements the City made in its certified filing determined the extent of the water right. The City's filed statement is too lengthy to completely set out in this opinion. It may be summarized as follows: The City, (in said filing) stated that for the past twenty (20) years, they had been the owners of a pumping plant and water works system by means of which certain waters of the Nueces River were diverted and pumped through a pipeline from the Nueces River to the City of Corpus Christi for the purpose of supplying the inhabitants of said City with a water

supply. No land was to be irrigated by this system. With the pumping plant operating under a pressure of 100 pounds per square inch, and the relay plant under a pressure of 80 pounds p.s.i., the capacity of the present pipeline was 0.93 c.f.s. The capacity prior to the installation of the Relay Plant was estimated at 0.62 c.f.s. C.F. 64 contains this further statement: "Between Nueces Bay and the point at which the pump is situated a dam by the City constructed across said river, which serves to keep the salt water of the bay from contaminating the sweet or fresh water of the river."

The City contends that although initially (under C.F. 64) the maximum capacity of its pipeline was 0.93, which represented the amount of water being used at that time (1913), the City should not be limited in the future by such rate, but on the contrary, it should have the right to use all of the dependable yield of the reservoir at Calallen which is 4.4 c.f.s. The City states that the District Court erred in not changing the rate of diversion from 0.93 c. f. s. to 4.4 c.f.s. because the City of Corpus Christi has and is increasing in population and, therefore, its needs are increasing. It, therefore, contends that it should be allowed to divert more water than 0.93 c.f.s. to satisfy its future needs under C.F. 64. In this connection, the City has cited to us numerous cases for the proposition that a city in looking to its future needs, is not limited to the extent of its diversion works at the time of its initial application to appropriate water, but is entitled to gradually increase its use as needed. Citing *Van Tassel Real Estate and Livestock Co. v. City of Cheyenne*, 49 Wyo. 333, 54 P.2d 906 (1936); *Holt v. City of Cheyenne*, 22 Wyo. 212, 137 P. 876 (1914); *City and County of Denver v. Brown*, 56 Colo. 216, 138 P. 44 (1914); *City and County of Denver v. Sheriff*, 105 Colo. 193, 96 P.2d 836 (1939). In reviewing these cases, we find that such cases are not in point. In the above cited cases. the Courts held generally that the Cities involved therein, although initially using less water than was granted to them under their permits (or adjudicated as being able to appropriate), they were

entitled to use (in the future) up to that amount granted by their permits (or that adjudicated to them) without having lost the right to the balance of the water not used at a particular time.

Both the City's and the Robstown District's diversion points are located within the 10 1/2 mile natural enlargement, the Robstown District diversion point being upstream about a mile from that of the City's. This portion of the river has a holding capacity of 40,400,000 cubic feet or 928 acre-feet of water. The dependable yield from this natural enlargement behind the dam built by the City, is 4.4 c.f.s. If we were to now hold that the City's diversion rate under C.F. 64 should be enlarged from 0.93 c.f.s. to 4.4 c.f.s., this would reduce the volume of water available to the Robstown District and cause them to be dependent on the storage in Lake Corpus Christi for part of Robstown District's water supply with the resulting expense necessarily present with such storage.

After reviewing the City's water right in detail (C.F. 64), there appears to be no overt indication or intention on the part of the City to make an appropriation of water for its future needs in excess of 0.93 c.f.s. at the time the City perfected its right. For instance, the City in its C.F. 64 stated that the capacity of its water line was 0.93 c.f.s. and in a supplemental sworn statement to C.F. 64, the City states that all of its water system is *in actual use and complete with no further work to be done.*

It is significant that in May 1914, the City made another application (No. 29) to the Board of Water Engineers for a permit to appropriate waters in addition to that already appropriated under C.F. 64 (0.93 c.f.s.). In this connection, if the City believed it was not limited to 0.93 c.f.s., but was entitled to the entire yield (4.4 c.f.s.) of the reservoir, there would not have been any necessity for the City to seek an additional water right. In the "Second Report of the Board of Water Engineers for The State of Texas" covering the years 1914 to 1916, which summarizes all claims of water rights on the rivers of Texas, the City's

declared rate of continuous use in cu. ft. per second under C.F. 64 was 0.93. It is, therefore, clear to us that the City's rights under C.F. 64 were limited to 0.93 c.f.s., the amount claimed by the City. The trial court was correct in so holding.

## THE PRIORITY DATE OF C.F. 64

The Robstown District by cross-point asserts that the trial court erred in holding that the City's C.F. 64 had a priority date of 1895 in that there is no possible way under the laws of Texas that C.F. 64 can properly be given a priority date earlier than December 26, 1913. The City, however, contends that the trial court properly held that the priority date of C.F. 64 was 1895 because of the Special Salt Water Barrier Act of 1895 which Act authorized the erection of the dam. (Tex.Laws 1895, Ch. 4, at 28, 10 H. Gammel, Laws of Texas 922, 1895). The City further contends that the court's holding would also have been proper as the Acts of 1889 and 1895 were not the exclusive methods for acquiring an appropriative right with the resulting prior priority.

It is undisputed that the City's C.F. 64 was filed originally on December 26, 1913. It is unclear to us whether the City is asserting that its priority of 1895 is based on the General Irrigation Act of 1895, (Tex. Laws 1895, Ch. 21, §§ 1–7 at 21, 10 H. Gammel, Laws of Texas 751, 1895) or the Act of 1895 which granted to the Corpus Christi Water Supply Company (a private company), the right to construct a dam across the Nueces River. Both will be discussed.

Under the General Irrigation Act of 1895, a specific method was designated by the Legislature whereby one could obtain a legal water right. The act provided that in order to appropriate waters of the streams and rivers of Texas, the appropriator must, within 90 days after the act went into effect or within 90 days after commencement of construction of its water works system, file with the county clerk a sworn statement in writing setting forth certain required information. Upon compliance with such requirements, Section 7 of the Act

provided that the claimant's right to the use of the water would "relate back", (as far as priority is concerned), to the time when the work of excavation or construction was commenced. The General Irrigation Act of 1889 (Tex.Laws 1889, Ch. 88, §§ 1–8 at 100, 9 H. Gammel, Laws of Texas 1128, 1889) was in substance essentially the same as this 1895 Act. It also provided for "relation back" as to priority. Therefore, if the City of Corpus Christi had filed its declaration to appropriate water with the county clerk, pursuant to either of these Acts and had complied with the provisions thereof, the City would have received the benefit of "relation back" to the time it commenced its water works. But the City did not do this.

■ There are no pleadings or evidence that the City acquired its rights pursuant to either of these two Acts. On the contrary, it appears that the City of Corpus Christi filed its C.F. 64 pursuant to the Irrigation Act of 1913. (Tex.Laws 1913, Ch. 171, §§ 1–14, at 358, 16 H. Gammel, Laws of Texas 358, 1913). The principal purpose and function of the 1913 Act was to substitute the permit system (of obtaining a statutory water right under state administration) for the ex-parte declaration of the appropriative system theretofore existing under the General Irrigation Acts of 1889 and 1895. Such is evidenced by Section 15 of the Act, which provides that, after the effective date of the Act, water appropriation can be made only by permit issued by the Board of Water Engineers.

■ The Legislature, however, took cognizance of the fact that there were possibly some "persons" using water who had failed to make a statutory appropriation under either the 1889 or 1895 Acts. The exact situation that existed on the part of the City of Corpus Christi. The Legislature provided in Section 12 of the Act that those persons (by taking certain steps) could obtain the vested right to continue their uses effective as of the date of compliance with this Act. The Legislature, in Section 14, was careful to limit the amount of water which could be appropriated to: "the

amount or volume thus being actually used and applied." Unlike the Acts of 1889 and 1895, the Act of 1913 specifically negates the doctrine of "relation back" to certified filings authorized by the Act. Section 14 reads in part as follows:

"Every person, association of persons, corporation or irrigation district, *who has*, prior to the first day of January, 1913, *actually taken or diverted any water* and applied same to any of the uses and purposes named in this Act, and *is at the date of the filing of the statement herein provided to be filed, continuing to use and apply such water*, who shall, *within one year* after this Act shall go into effect, *file with the board the sworn statement* last described in this Section, *shall, as against the State, have the right to take and divert such water to the amount or volume thus being actually used* and applied; *provided, that nothing herein shall be construed to affect or relate to any priority or right as between any claimants, appropriators, or users from any source of water supply*." (Emphasis supplied.)

Therefore, since the City has perfected its appropriative right under C.F. 64 pursuant to the 1913 Act rather than the 1889 or 1895 Acts, the City's priority under C.F. 64 cannot be backdated to any date prior to 1913.

The City of Corpus Christi also attempts to increase its rights under C.F. 64 above 0.93 c.f.s. and to obtain a priority date of 1895 by contending that the Special Salt Water Barrier Act of 1895 granting to the City some type of exclusive vested right to appropriate public waters. The City further contends that by erection of the dam, authorized under the Act, the City acquired the right to use the water and such right attached at the time the dam was built. We disagree with these contentions. There are no pleadings by the City of an independent water right under this Act and the public records of both the City and Commission fail to show any such right. According to the City's annual water service reports no other rights except those under its permits and certified filing are asserted. The

question, therefore, is whether such act in and of itself created a separate water right in the City existing for 18 years before C.F. 64 was filed. Said Act reads in part as follows:

"CHAP. 4—[H.B.No.740.] An act to grant to S. M. Leary, N. Gussett, E. A. McCampbell and D. Reid, comprising the Corpus Christi Water Supply Company, the right to construct a dam across the Nueces River.

Section 1. Whereas, the people of Corpus Christi obtain their water supply from the Nueces river; and

Sec. 2. Whereas, the water at times becomes salt and unfit for use because of the inflow of water from the bay into which the river empties; therefore,

Be it enacted by the Legislature of the State of Texas:

That the said S. M. Leary, N. Gusset, E. A. McCampbell and D. Reid, be and the same are hereby authorized to erect a dam across said Nueces river at some place between its mouth and a point fifteen miles above . . ."

The above Act contains no words of grant except the right to build a barrier dam in the bed of the river to prevent the intrusion of salt water from the bay. There is no grant to the City of a right to use any or all of the flow of the river. It does not contain the essential elements of an appropriation, such as the authorized rate of diversion, the point of diversion, the volume of storage or the annual volume of use. Under the General Irrigation Act of 1895, which was passed a few weeks prior to this Special Act, the Legislature established certain guidelines which must be met in order to legally appropriate waters of the rivers or streams of the State. Upon a reading of the two Acts (Irrigation Act 1895 and Special Act 1895), it is clear that the Special Salt Water Barrier Act of 1895 granted no appropriative right to the Corpus Christi Water Supply Company and only by compliance with the General Irrigation Act of 1895 could the City have obtained an appro-

priate right at that time to the use of the waters of the Nueces River.

The erection of the dam, as authorized by the Special Act, did not in and of itself create a water right in the City. The erection of the dam was but one step in securing a water facility for the City. The dam prevented the intrusion of salt water upstream. The purchase of an acre of land on which to build the City's diversion facility and water works was another step. The installation of a water pump and the connection of a water line was still another step. Not one nor all of these steps gave the City a legal water right. The City by building the water works system, without doing anything more to comply with the law, did not acquire any right to use all the water trapped behind the dam. The City's C.F. 64 was inferior to the Robstown District's water right, as such District had complied with the law prior to the time the City did. The City could not have acquired a prescriptive right against the State of Texas, in any event. See Hutchins, the Texas Law of Water Rights, p. 451. While the Corpus Christi Water Company owned a lawful dam in the year 1909, it did not own a lawful water right. It was using the water only on a permissive basis. This did not vest in the City a water right until the City complied with the law in 1913. The City's water superintendent testified that the average annual flow of the Nueces River at the Three Rivers gauge upstream from the Calallen and Mathis Dam is 600,-000 acre-feet per year. The City by diverting a few hundred acre-feet per year from the natural flow of the river at Calallen from 1895 until its certified filing was perfected in 1913, was diverting only an infinitesimal quantity of water out of the total volume of water flowing down the river. At that particular time, there was no reason for anyone to complain that the City was diverting water permissively and without a valid water right.

Therefore, absent legislative sanction of "relation back" by the Irrigation Act of 1913, pursuant to which the City filed C.F. 64, and absent a perfected appropriative right by the City under either the 1889 or 1895 Irrigation Acts, the priority date of C.F. 64 could not be set on any date prior to December 26, 1913, the day on which the City took the first step toward complying with the statutory method of appropriating public waters.

The City finally contends that in light of the several findings by the court to special issues and to certain correspondence between the Robstown District and the City wherein the Robstown District allegedly admitted that its rights were inferior to the City's rights, the priority date of 1895 as fixed by the trial court was correct. The trial court found, as we have herein stated, that: the dam constructed about 1893 at Calallen provided a reservoir; that it contained water suitable for domestic use; that the purpose of constructing the dam was to provide a water supply for the City; and that the City has used water from the reservoir continuously from 1893 to present. The correspondence referred to above dated May 4, 1922, included a statement made by the Robstown District to the City in which they said:

"The grant made to us by the Board of Water Engineers for diversion of water was based on the present situation that your right is prior to ours and that further the right of all cities for water is ahead of any right for commercial use."

At that time, the only right granted to the Robstown District by the Board of Water Engineers was Permit 529 with a 1921 priority date. The reference to the "grant made to us by the Board of Water Engineers" could not have included C.F. 70 in that the Board of Water Engineers had not yet been created.

Finally, it is important to note that the City has never reported the annual use of water as a separate right (under the 1895 Act) prior to 1913. The records of the Water Rights Commission do not show such a prior right, but specifically refer to the City's C.F. 64 right as having a priority date of 1913. Absent a showing that the City's rights under C.F. 64 were perfected under the Irrigation Acts of 1889 or 1895 or

the Special Act of 1895 which authorized the building of the dam, the trial court was in error in fixing a priority date at some unstated time in 1895. We hold that the priority date of certified filing 64 by application of the statutes and the laws of Texas to the undisputed facts, is December 26, 1913. The judgment of the trial court is reversed and judgment is here rendered setting the priority date of C.F. 64 at December 26, 1913. Rule 434, T.R.C.P.

The appellant City next asserts in Points 42–44 that the trial court erred in refusing to submit to the jury its requested special issues Nos. 4, 6 and 7. These three issues asked whether the City of Corpus Christi had possession of the dam and used the dam and reservoir at Calallen for a ten (10) year successive period either prior to 1909, or after 1909 but before 1922, or for a ten year successive period after 1922. The City asserts that the evidence shows that the City has a prescriptive right (as against the Robstown District) to the use of all the water in the reservoir at Calallen and, therefore, said issues should have been submitted to the jury.

One who asserts a water right by virtue of adverse use has the burden of proving satisfactorily and unequivocally the elements that would constitute adverse use. 60 Tex.Jur.2d Waters § 123; 78 Am.Jur.2d Waters §§ 347–349. A prescriptive right to the use of water may be acquired only through continuous, adverse, and hostile use of the water, or use of an open and notorious character, which continues without interruption throughout the entire term fixed by the statute, with actual or constructive notice to the owner whose rights are involved. See *Stratton v. West,* 201 S.W.2d 80 (Tex.Civ.App.—San Antonio 1947, no writ); 50 Tex.Jur.2d Waters § 122; Hutchins, The Texas Law of Water Rights, pp. 444–448.

The three requested special issues relate to three different periods of time, i. e., prior to 1909; after 1909 but before 1922, and after 1922. The Robstown District asserts that the City failed to introduce any evidence to sustain the burden of proof that

the City had acquired a prescriptive right against the Robstown District.

With respect to special issue No. 4, inquiring about the pre-1909 period, the evidence shows that the City could not have obtained a prescriptive right against the Robstown District or its predecessors (Fryckberg) since the Robstown District's predecessors at that time owned no water right to be prescribed against. See Hutchins, The Texas Law of Water Rights, p. 447; *Martin v. Burr,* 228 S.W. 543 (Tex.Sup. 1921). The trial court, therefore, did not err in refusing to submit requested special issue No. 4 to the jury.

There is also the requirement that prescription must be such an invasion of a right as to give rise to a cause of action. Hutchins, The Texas Law of Water Rights, p. 444, et seq.; *Mud Creek Irr., Agr. & Manuf'g Co. v. Vivian,* 74 Tex. 170, 11 S.W. 1078 (1889); *Houston Transp. Co. v. San Jacinto Rice Co.,* 163 S.W. 1023 (Tex. Civ.App.—El Paso 1914, no writ). The adverse use of water, to open into a prescriptive right, must have been commenced and continued under a claim of right inconsistent with and hostile to the claim of another. This adverse assertion of a right to divert and use water must not be only a claim of right, but also a claim of paramount right— otherwise stated as a claim of exclusive ownership. Hutchins, The Texas Law of Water Rights, p. 447. See also *Heard v. State,* 204 S.W.2d 344 (Tex.Sup.1947); *Kountz v. Carpenter,* 206 S.W. 109 (Tex.Civ. App.—El Paso 1918, no writ). This prescriptive right involves hostility to the rights of the rightful owner and results in injury and detriment to the owner whose right is prescribed. *Martin v. Burr,* supra; *Toyaho Creek Irr. Co. v. Hutchins,* 21 Tex. Civ.App. 274, 52 S.W. 101 (1899 writ ref'd).

Here, we are unable to find any evidence of such hostility by the City to the rights of the Robstown District resulting in injury to the Robstown District. In fact, the record shows that the Robstown District and the City of Corpus Christi worked together and cooperated with each other.

The Robstown District voluntarily cut back their rate of diversion on several occasions so as to help the City when their water supply ran low and the City needed water for its inhabitants. Such voluntary reduction by the Robstown District at the City's request cannot be considered a hostile action on the part of the City against the rights of the Robstown District. There is no evidence that the Robstown District was injured, nor that the use of the water by the City which the Robstown District was entitled to, occurred for ten (10) successive years. There is no evidence that the Robstown District was put on notice, either actual or constructive of the prescriptive rights claimed by the City. Therefore, the City having failed to raise evidence on all the elements necessary to entitle it to a prescriptive right, the trial court's action in refusing to submit said issues was correct. The City's points of error Nos. 42, 43 and 44 are overruled.

There also appears a further reason why such points should be overruled. There is a principal which we adopt, that— prescription does not run upstream. Since the City's diversion point is downstream from the District's, a prescriptive right cannot therefore occur against the Robstown District. *Mud Creek Irr., Agr. & Manuf'g Co. v. Vivian,* supra.

The City in its points of error 45 and 46 assert that the trial court erred in refusing to submit to the jury their requested special issues 8 and 9. These issues which were requested, asked whether the Nueces River Irrigation Company wilfully abandoned the right to use water under C.F. 70 or wilfully abandoned the right to use more than 2,083 acre feet of water annually for any three consecutive years. See Article 7544, Tex. Rev.Civ.Stat.Ann.

The Nueces River Irrigation Company acquired its waters under C.F. 70 from J. L. Fryckberg in 1909. The defendant District became successor to the company's rights in 1921 when said District was created. Therefore, the abandonment, if any, which the City now claims had to occur between 1909 and 1921. The City has, therefore, waited more than forty years to litigate this matter. There has been no showing that the District's certified filing or any portion thereof has been forfeited by statutory proceeding. Article 7474, Tex.Rev.Civ. Stat.Ann. (1954); Article 5.144, Tex.Water Code Ann. (1972). See also *Nueces County Water Control And Improvement District No. 3 v. Texas Water Rights Commission,* 481 S.W.2d 930 (Tex.Civ.App.—Austin 1972, writ ref'd n. r. e.).

An essential element of abandonment is the intention to abandon and such intention must be shown by clear and satisfactory evidence. *City of Anson v. Arnett,* 250 S.W.2d 450 (Tex.Civ.App.—Eastland 1952, writ ref'd n. r. e.); *Lower Nueces River Water Supply District v. Cartwright,* 274 S.W.2d 199 (Tex.Civ.App.—San Antonio 1954, writ ref'd n. r. e.). The statute under which the City now claims that the District abandoned its rights under C.F. 70 requires that such right be "wilfully abandoned". The City of Corpus Christi states that since the water use records do not show that any water was used by the Nueces River Irrigation Company or by the defendant Robstown District between the years 1913 to 1923 the Robstown District abandoned its rights under C.F. 70. The above facts alone do not show a wilful intent by the District to abandon its rights under C.F. 70. The mere nonuse for the three year period prescribed by Article 7544, Tex.Rev.Civ.Stat. Ann., without a wilful intention to abandon will not result in the loss of a right under a permit. See *City of Anson v. Arnett,* supra; *Lower Nueces River Water Supply District v. Cartwright,* supra; *State v. Hidalgo County Water Control and Improvement District No. Eighteen,* supra; Hutchins, The Texas Law of Water Rights, p. 426; *State Board of Water Engineers v. Slaughter,* 382 S.W.2d 111 (Tex.Civ.App.—San Antonio 1964, writ ref'd n. r. e., 407 S.W.2d 467). The burden of proof on abandonment is upon that party who asserts it. The party so asserting abandonment must show by clear and satisfactory evidence a wilful intention to abandon. This, they failed to do. After reviewing the entire record, we

find no evidence showing a wilful intention by the District to abandon any part of their rights under C.F. 70. Since the City and the Supply District failed to introduce any evidence of a "wilful intent" to abandon, they were not entitled to the submission of such issues. Therefore, appellant's points of error covering these points are overruled.

The Robstown District in reply to numerous points of error of the City (1–13, 15–32, 33–41 and 63 and 64) contend that those claims arising more than forty (40) years prior to the time the City filed suit are all now barred from being asserted by the doctrine of laches, stale demand and estoppel as a matter of law. The Robstown District has been diverting water from the natural enlargement in the Nueces River near Calallen every year for more than 40 years prior to the filing of this suit in April of 1964. With the City's full knowledge, the construction of the original pumping plant and canal system was commenced by the Robstown District's predecessor in title in 1909 and this was placed in operation in 1911. The Robstown District, with the City's full knowledge, enlarged and rebuilt the system in 1921. It has invested large sums of money in the original and continuous improvements of its water system. This system has been in continuous operation from 1921 until the present time. The farmers within the District and inhabitants of the City have come to rely upon the Robstown District for their water needs. The Robstown District asserts that the City has stood idly by while the Robstown District was organized and acquired C.F. 70 and during the time when the original Fryckberg properties obtained Permit 529. Under such a situation, the Robstown District contends that if the City ever had a cause of action against the Robstown District on any of the grounds hereinafter set out, such cause of action arose and accrued more than 40 years prior to the filing of this suit and, therefore, comes too late as a matter of law. Those claims which the City asserts and which the District now claims are barred are:

1) That C.F. 70 was totally or partially abandoned prior to 1925.

2) That C.F. 64 is prior in time and therefore, prior in right over C.F. 70.

3) That the City is authorized under C.F. 64 to divert and use the first 4.4 c.f.s. of water in the Nueces River at the City's Point of diversion.

4) That the City is authorized under C.F. 64 to divert and use all of the water occurring below sea level in the 10½ mile natural enlargement and deepening of the Nueces River near Calallen exclusive of the concurrent natural flow.

5) The claim by the City that the Robstown District is not entitled under either C.F. 70 or Permit 529 to divert and use, an order of legal priority, any of waters occurring in the natural enlargement and deepening of the Nueces River near Calallen exclusive of the concurrent natural flow.

6) That C.F. 64 was not combined and consolidated into Permit 51 and that C.F. 64 has not lost its identity to a separate water right.

7) That Robstown District has been diverting and using waters to which the City of Corpus Christi is entitled and for the use of such waters Robstown District is obligated to make payment to the City.

█ Two of the essential elements of laches are: 1) unreasonable delay by one having legal or equitable rights in asserting them; and 2) a good faith change of position by another to his detriment because of his delay. The undisputed evidence shows that both of these elements were present. See *City Of Fort Worth v. Johnson,* 388 S.W.2d 400 (Tex.Sup.1964); *Culver v. Pickens,* 142 Tex. 87, 176 S.W.2d 167 (1943). As to laches, the Robstown District (with respect to claims 1, 2, 3, 4, 5 and 7 above) had the burden of proving not only unreasonable delay and lack of diligence by the City of Corpus Christi in asserting its claims of abandonment of C.F. 70 prior to 1925, or that the District was not entitled to divert more than 166 acre feet of water for municipal purposes, but also that its position had

in good faith, been changed because of the delay.

■ C.F. No. 70 was issued to Fryckberg on February 17, 1909, which provided for the irrigation of approximately 4,303.1 acres. On July 22, 1909, Fryckberg conveyed his rights under C.F. 70 to the Nueces River Irrigation Company (the Robstown District's predecessor). The record shows the following undisputed facts: 1) that water was used by the Robstown District in the years 1911, 1912 and 1913; 2) no water use report was filed with the Board of Water Engineers thereafter until 1916 when the water use report stated "No water used in 1916. Plant out of Order"; 3) the next report was made in 1923. The record shows, however, that in 1923 and every year thereafter water was used pursuant to C.F. 70. Since no water was used for a ten year period between 1913 and 1923 the City now claims that there was a total or partial abandonment of the Robstown District's C.F. 70.

The City has stood by for over 40 years while the Robstown District has continuously diverted water pursuant to C.F. 70. If the City had any claim of abandonment, it had to have been in 1923, it is obviously unjust and unfair for the City to stand idly by, watching the Robstown District become dependent upon the validity of C.F. 70, and then 40 years later claim that such right was lost due to the alleged abandonment by the District prior to 1923. The City's points of error Nos. 3–41 and 45, 46 are overruled for the further reason that such claims as here and in the trial court asserted are barred under the doctrine of laches.

■ The City of Corpus Christi in its brief brings forward points of error Nos. 47–62 but fails to argue or set out any authorities in support of the points of error. The City subsequently filed an Application to Amend its brief. The City first asserts that its argument and authorities in support of points 47, 48, 49, 50, 51, 52 and 58 (relating to the change in use by the District under C.F. 70 and Permit 529) appears on pages 60–69 of its brief. Such argument does appear on those pages and is in fact argument in support of the above points. For such reason, the brief should be amended accordingly. Rule 431, T.R.C.P. The City next asserts in its Application to Amend its brief that points 61 and 62 were not briefed and should have been and, therefore, the City requests that its amended brief be considered. The amended brief is therefore, ordered filed. We now consider points of error Nos. 61 and 62 in which the City contends that the trial court erred in giving a priority date of 1909 to C.F. 70 or any value or priority to such water right.

The City more specifically asserts that it was conclusively shown that there was no compliance by J. W. Fryckberg or the Nueces River Irrigation Company, with the Irrigation Act of 1895 in that the construction under such filing did not begin within ninety days after the filing of the statement, nor did the District show that after the work was begun, it was prosecuted diligently and continuously to completion as the Act so states that it shall be. The City asserts that at the time Fryckberg assigned his right under C.F. 70, the work had not yet begun. The City asserts that a period of approximately 123 days elapsed from the date of filing C.F. 70 before work was commenced, and that it was not until 1911 when water was first used. These points are without merit for several reasons.

First, the City's pleadings are insufficient to support a judgment in the City's favor based on the above argument even if there was evidence to support it. The City with respect to C.F. 70 pled only that the District's rights under C.F. 70 were lost due to abandonment (non-use or change in use) and not for failure to begin construction within 90 days. The pleadings presupposes the validity of C.F. 70, otherwise, there could be no abandonment. In the second place, there was no evidence introduced by the City showing the actual date of construction or that such construction was not prosecuted with diligence to completion. There was no showing that such rights had been forfeited or cancelled in accordance with Section 5.144 Tex.Water Code Ann. due to abandonment as the law provides.

See also *State v. Hidalgo County Water Control & Improvement District No. 18,* supra.

Additionally, the claim by the City is barred by the doctrine of laches. If, in fact, the work had not begun within 90 days and not completed thereafter with diligence, then the City, knowing the same, has stood by since 1911 allowing the District to rely upon their rights under C.F. 70. There is one additional reason, that being that the City did not make a proper assignment of error in its motion for new trial. See Rules 320, 321, 322, 324, and 374, T.R.C.P.; *Wagner v. Foster,* 161 Tex. 333, 341 S.W.2d 887 (1960); *Collins v. Smith,* 175 S.W.2d 407 (Tex.Sup.1943); *Smith v. Brock,* 514 S.W.2d 140 (Tex.Civ.App.—Texarkana 1974, no writ); *Torres v. Duaine,* 496 S.W.2d 773 (Tex.Civ.App.—Corpus Christi 1973, no writ). The City's points of error Nos. 61 and 62 are overruled.

■ Finally, the City, in its points of error Nos. 63 and 64 assert that the trial court erred in failing to hold and declare that no right of the City of Corpus Christi in Permit No. 933 had been abandoned and that such permit in its entirety was a valid water right. It appears that in 1927, the City of Corpus Christi secured Permit No. 933. Under this permit, the City was authorized to construct a dam and to appropriate and impound 500,000 acre-feet of water from the Nueces River. However, in 1934 a dam was constructed with a capacity of only 60,000 acre-feet of water. In 1948, Permit 933 was amended by Permit 1463. This amended permit sets forth how the 500,000 acre-feet of water is to be allocated. In 1953, Permit 1656 was issued authorizing the Supply District to construct and maintain a dam having a storage capacity of 300,000 acre-feet of water for the City of Corpus Christi for the uses as authorized. The dam was finally constructed and is known as the Wesley Seale Dam, having a capacity of 300,000 acre-feet of water.

The trial court in its judgment held that the City was authorized by Permit 933, as amended by Permit Nos. 1463 and 2026 to impound and divert, not to exceed 60,000 acre-feet of water per annum; that the City is authorized by Permit 1656 to pump and divert out of the water impounded in said 300,000 acre-foot reservoir (Wesley Seale Dam) not to exceed 300,000 acre feet of water per annum. The trial court did not find that the City had abandoned any rights under Permit 933, nor did it hold that such permit was not a valid water right. There has been no statutory forfeiture of the City's rights under Permit 933. The trial court did not so hold, nor do we.

The City herein now asserts that plans are underway to build an additional dam for the future supply of the City and the area, and Permit 933 will again be involved authorizing the City to appropriate and impound 500,000 acre-feet of water from the Nueces River.

It appears to us that in view of such a contingent occurrence, the City is asking us to adjudicate a matter which is not necessary to the disposition of this case. Appellant's points of error 63 and 64 are accordingly overruled.

We have considered all of the appellants' (City and Supply District's) points of error and except where they are specifically sustained herein, they are all overruled.

Appellee Robstown District's first cross-point is sustained, the second cross-point is overruled.

The judgment of the trial court is AFFIRMED IN PART, CORRECTED IN PART, REVERSED AND RENDERED IN PART AND REVERSED AND REMANDED IN PART.