# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00252-CV

**Engelman Irrigation District, Appellant**

**v.**

**Texas Commission on Environmental Quality and Shields Brothers, Inc., Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
## NO. D-1-GN-04-003790, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## O P I N I O N

This appeal concerns the denial of Engelman Irrigation District's application for authorization to proceed in federal bankruptcy. Declaring itself unable to meet its debts and other obligations as they mature, Engelman sought bankruptcy authorization from the Texas Commission on Environmental Quality ("Commission"). *See* Tex. Water Code Ann. § 49.456(a)-(d) (West 2000) (no district may proceed in bankruptcy until authorized to do so by written order of the Commission). After a three-day hearing before an Administrative Law Judge ("ALJ") at the State Office of Administrative Hearings, the Commission issued a final order denying Engelman's bankruptcy application. Engelman sought review in district court, and the district court affirmed the order of the Commission. Engelman now appeals. For the reasons that follow, we affirm the judgment of the district court.

**BACKGROUND**

The course of this nearly twenty-year dispute over the provision of irrigation waters from the Lower Rio Grande, roiled by a decade-long delay in paying a final judgment, was channeled into this Court's jurisdiction when the debtor irrigation district sought the Commission's authorization to declare bankruptcy.

Engelman, an irrigation district in Hidalgo County, Texas, created pursuant to article XVI of the Texas Constitution, is a governmental agency of the State that is under the supervisory authority of the Commission. On January 30, 1995, Shields Brothers, Inc., obtained a jury verdict against Engelman for breach of contract as a result of Engelman's failure to deliver irrigation water that Shields Brothers had purchased in the early 1990s.[1] The trial court awarded Shields Brothers $397,606.07 in actual damages, pre-judgment interest, and attorney's fees and ordered that the judgment bear interest at 10% per annum from March 22, 1995, until paid. The judgment was affirmed on appeal and became final in December 1998. *See Engelman Irrigation Dist. v. Shields Brothers, Inc.*, 960 S.W.2d 343 (Tex. App.—Corpus Christi 1997), *pet. denied*, 989 S.W.2d 360 (Tex. 1998) (per curiam).

Beginning in February 1999, Shields Brothers filed motions in the trial court to order Engelman to levy, assess, or collect taxes or assessments in order to pay the judgment. At that time, Engelman made its first "settlement and satisfaction of debt agreement" offer, proposing to pay

---

[1] Shields Brothers was a farming operation that had contracted to have Engelman deliver irrigation water for its cotton, grain, and watermelon crops. The jury in the underlying cause heard evidence that Engelman intentionally breached the water-delivery agreement, having made the decision that it would "cut off" Shields Brothers's water supply, which ultimately put Shields Brothers out of business.

Shields Brothers $50,000 upon full execution of settlement documentation, proceeds from the sale of all of its oil and gas mineral interests, and annual payments of $25,000 for seven years. Shields Brothers refused the offer.[2] In response, Engelman declared itself unable to pay the Shields Brothers judgment and, in March of 1999, activated the bankruptcy-authorization process provided under the water code. *See* Tex. Water Code Ann. § 49.456(a)-(d); *see also* 30 Tex. Admin. Code § 293.88 (2005) ("bankruptcy-authorization rule").

Under the water code, a district that is subject to the continuing supervision of the Commission, such as Engelman, may not proceed in bankruptcy unless it is authorized to do so by written order of the Commission. *See* Tex. Water Code Ann. § 49.456(a). When a district submits a bankruptcy application to the Commission for approval, the Commission "shall investigate the district's financial condition," including its assets, liabilities, and sources of revenues. *Id.* § 49.456(c). The Commission shall deny a district's application unless it determines that the district cannot, through the full exercise of its rights and powers, reasonably expect to meet its debts and other obligations as they mature. *Id.* § 49.456(d). But even if the Commission does determine that a district cannot reasonably expect to meet its debts through the full exercise of its rights and powers, the decision to authorize a district to proceed in bankruptcy is made at the Commission's discretion. *See* 30 Tex. Admin. Code § 293.88(c) ("If, after consideration of all evidence, the commission determines that the district cannot . . . reasonably expect to meet its debts and other obligations as

---

[2] In subsequent filings, Shields Brothers asserted that it had refused the settlement offer because (1) the cash payments were less than 50 cents on the dollar of the value of the judgment at the time of the offer and (2) there had been no appraisal of the mineral interests.

they mature, the commission *may* authorize the district to proceed in bankruptcy.") (emphasis added).

Shields Brothers opposed Engelman's application and submitted evidence to the Commission that Engelman did in fact have the ability to pay the judgment owed to Shields Brothers. As of May 31, 2002, the amount of the outstanding judgment with all of the accrued post-judgment interest was $789,893.52.

Following its investigation of Engelman's financial condition, the Commission issued an interim order in 2002 denying the bankruptcy request and referring the matter to the State Office of Administrative Hearings "to develop facts and any limitations in law with regard to specific measures to generate revenues to meet the District's obligations." Engelman, Shields Brothers, and the Commission were all parties in the SOAH proceeding.

After conducting a hearing on the merits, the ALJ issued a proposal for decision, recommending that the Commission find that Engelman, in order to meet its debt obligations, could: (1) sell some of its water rights; (2) sell all of its mineral rights; (3) sell some of its water allocations; (4) increase its assessments to irrigators; and, with Commission approval, (5) obtain a long-term revenue note.

On September 7, 2004, the Commission issued its final order denying Engelman's application to proceed in bankruptcy ("Order"), concluding that Engelman can, through the full exercise of its rights and powers, reasonably expect to meet its debt obligations. The Order largely adopted the findings of the ALJ, identifying the same five measures that the ALJ had determined Engelman could use to generate revenue. The Order further directed Engelman to "adopt specific measures to generate sufficient revenue to settle the judgment against it," which "may include but

4

are not limited to a combination of those specified" in the Order. In determining that Engelman could sell some of its water rights, one of the most contentious issues in this case, the Commission made several fact findings, including: (1) Engelman has a current balance of 20,031 acre-feet of water rights, but only 7,498 irrigable acres within its boundaries; (2) Engelman has 1,286 acre-feet of "excess water rights"; (3) Class A water rights, the type owned by Engelman, are in high demand and are worth at least $1,200 to $1,500 per acre-foot; (4) Engelman possesses 427.78 "excluded" acres with irrigation water rights that it can sell to municipalities; and (5) Engelman has sold 3,064 acre-feet of its original certificated water rights.

Engelman sought judicial review and reversal of the Order in district court, asserting that the Order was not supported by substantial evidence, that the Order violated Engelman's substantial rights by forcing it to raise money by means that violated the constitution and laws of Texas, and that the Order was arbitrary and capricious because the Commission exceeded its authority and failed to order Engelman to adopt specific measures to raise the money to pay the Shields Brothers debt. The district court affirmed the Order of the Commission in all respects, and Engelman appeals.[3]

## DISCUSSION

In five issues, Engelman asserts that the district court erred in affirming the Order because Engelman has no ability to reasonably expect to meets its debts and other obligations as they

---

[3] Following argument before this Court, we issued an order referring Engelman and Shields Brothers to mediation, but we received notice on March 5, 2008, that the parties had failed to resolve their dispute.

5

mature, requiring the Commission to authorize Engelman's bankruptcy application as a matter of law. Specifically, Engelman asserts that (1) the Commission had no authority to order Engelman to sell water rights or other property in violation of the constitution and laws of Texas; (2) the Commission wrongly concluded that Engelman could borrow money to satisfy the Shields Brothers judgment and therefore the Commission's finding on this issue was unsupported by the evidence; (3) there is no evidence to support the Commission's finding that Engelman can increase its water assessments in an amount sufficient to satisfy the judgment; (4) the Commission failed to order Engelman to adopt specific measures to raise revenue in order to satisfy the judgment, as required by the Commission's bankruptcy-authorization rule; and (5) there is no evidence that Engelman can reasonably meet its debt obligations as they mature.

### *Standards of review*

Engelman's first issue requires us to construe the forced-sale provision of the Texas Constitution, *see* Tex. Const. art. XI, § 9, to determine whether the Commission has ordered a forced sale of Engelman's assets. This is a question of law, which we review de novo. *See Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). We are also asked to interpret various sections of the water code governing the Commission's authority to review Engelman's bankruptcy application and to require Engelman to exercise its statutory powers by adopting specific measures to meet its debt obligations. When interpreting a statutory provision, a court must ascertain and effectuate the legislative intent. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 383 (Tex. 2000). The construction of a statute by the administrative agency charged with its enforcement is entitled to great weight by reviewing courts. *State v. Public Util. Comm'n*, 883 S.W.2d 190, 196

6

(Tex. 1994); *Bexar Metro. Water Dist. v. Texas Comm'n on Envtl. Quality*, 185 S.W.3d 546, 550 (Tex. App.—Austin 2006, pet. denied).

Engelman's remaining arguments challenge whether the Commission's actions in denying its bankruptcy application were adequately supported by the evidence. We review these determinations under a substantial-evidence standard. *See* Tex. Gov't Code Ann. § 2001.174 (West 2000) (allowing court to reverse agency determination if party's substantial rights have been prejudiced because determination is not supported by substantial evidence). Under the substantial-evidence rule, we give significant deference to the agency in its field of expertise. *Railroad Comm'n v. Torch Operating Co.*, 912 S.W.2d 790, 792 (Tex. 1995). When a court is applying the substantial-evidence standard of review, the issue is not whether the agency's decision was correct, but whether the record demonstrates some reasonable basis for the agency's action. *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984); *Central Power & Light Co. v. Public Util. Comm'n*, 36 S.W.3d 547, 557 (Tex. App.—Austin 2000, pet. denied). In fact, the evidence may actually preponderate against the Commission's finding and be upheld as long as there is enough evidence to suggest that the Commission's determination was within the bounds of reasonableness. *Cities of Abilene v. Public Util. Comm'n*, 146 S.W.3d 742, 748 (Tex. App.—Austin 2004, no pet.). We evaluate the entire record to determine whether the evidence as a whole is such that reasonable minds could have reached the conclusion the agency must have reached in order to take the disputed action. *Texas State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d 114, 116 (Tex. 1988). Under this standard, we are prohibited from substituting our judgment for the Commission's as to the weight of the evidence on questions committed to agency

7

discretion. *Id.* We presume that an agency's order is supported by substantial evidence, and the complaining party has the burden of overcoming that presumption. *Id.*

We also use the substantial-evidence standard to determine whether the Commission complied with its own bankruptcy-authorization rule. An agency's interpretation of its own regulations is entitled to deference by the courts, even though that interpretation is not binding. *Public Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991); *Lone Star Salt Water Disposal Co. v. Railroad Comm'n*, 800 S.W.2d 924, 929 (Tex. App.—Austin 1990, no writ). We will reverse the Commission when it fails to follow the clear, unambiguous language of its own regulations such that its actions are arbitrary and capricious. *Power Res. Group, Inc. v. Public Util. Comm'n*, 73 S.W.3d 354, 357 (Tex. App.—Austin 2002, pet. denied). Thus, absent evidence that the Commission disregarded the plain language of its rules, we look to its expertise in calibrating various policy considerations. *Id.*

### *Sale of assets*

In its first issue, Engelman asserts that the trial court erred in affirming the Order because the Order requires Engelman to sell water rights in violation of the Texas Constitution, the water code, judicial decision, and the Commission's own bankruptcy-authorization rule. Engelman urges that, because the Commission lacked authority to require Engelman to sell its property in violation of the law, the Order is arbitrary, capricious, and an abuse of discretion. Within this issue, Engelman further alleges that the underlying judgment in favor of Shields Brothers is void as a matter of law, that the Order's findings of fact are clearly erroneous, and that its conclusions of law are unsupported by the evidence.

### A.    *"Forced sale"*

We first address Engelman's contention that the Order requires an unconstitutional forced sale of Engelman's assets. Article XI, section 9 provides that "all property devoted exclusively to the use and benefit of the public shall be exempt from forced sale and from taxation." Tex. Const. art. XI, § 9. The parties do not dispute that article XI applies to property that Engelman holds for public purposes; rather, they disagree as to whether the Order mandates a constitutionally proscribed "forced sale" of Engelman's assets. Engelman declares that the water rights that the Commission "wants Engelman to sell are derivative of the land in the district and the rights of persons owning land to which the water is appurtenant," and that the Order "effectively forces Engelman to choose from several equally unreasonable options for raising funds, [including] selling water rights and other property."

The Commission responds that the Order does not constitute a forced sale because it "does not require Engelman to sell anything." Rather, in its findings of fact, the Order sets forth that Engelman has the ability to sell some of its water rights, its mineral rights, and a portion of its water allocations. In its conclusions of law, the Order cites the specific provisions of the water code authorizing Engelman to sell these assets and, in ordering paragraph 2, states:

> The District shall adopt specific measures to generate sufficient revenues to settle the judgment against it. These measures may include but are not limited to a combination of those specified in Conclusion Of Law Numbers 3-9 [of the Order].[4]

---

[4] Conclusion 3 recites that the Commission has the authority pursuant to section 49.456 of the water code to require the District to exercise its statutory powers and to adopt specific measures to meet its debt obligations. Conclusions 4, 5, and 6 concern Engelman's authority to sell water rights, mineral rights, and water allocations, respectively. The remaining conclusions, which are not

9

According to the Commission, Engelman retains discretion at this stage to choose the means by which it can raise revenue, whether it elects to sell some combination of the assets identified in the Order or to utilize other means not considered by the Commission or the ALJ, including entering into agreements with Shields Brothers to restructure the debt.

There is scant authority construing the forced-sale prohibition contained in article XI, apart from a handful of cases involving liens against public building projects.[5] *See, e.g.*, *Atascosa County v. Angus*, 18 S.W. 563, 563 (Tex. 1892) (holding that builder's lien is not enforceable against public buildings and grounds except as expressly permitted by statute); *City of LaPorte v. Taylor*, 836 S.W.2d 829, 831-32 (Tex. App.—Corpus Christi 1992, no writ) (noting that legislature has provided limited statutory remedy supplanting materialman's lien in construction contract for public-works project, consistent with Texas Constitution's express exemption of public property from forced sale); *see also Quincy Lee Co. v. Lodal & Bain Eng'rs, Inc.*, 602 S.W.2d 262, 264 (Tex. 1980) (construction contract with entity created under article XVI, section 59 of Texas Constitution will in no event give rise to lien).

---

challenged in this issue on appeal, state that Engelman has the authority to borrow money for any corporate purpose, to borrow money through negotiable notes, and to increase its assessments and water charges in order to assist in meeting its debt obligations.

[5] The sole case cited by Engelman in support of its contention "that property owned by districts, like Engelman, created under Article XVI § 59 of the Texas Constitution are [*sic*] exempt from forced sale and taxation" sheds little light on the issue raised in this case. *See Lower Colo. River Auth. v. Chemical Bank & Trust Co.*, 190 S.W.2d 48, 50 (Tex. 1945) (noting in dicta that LCRA's enabling legislation exempted its property from forced sale). As mentioned above, there is no dispute that Engelman's water rights and allocations may not be the subject of a forced sale because these assets are the property of a governmental agency. *See Satterlee v. Gulf Coast Waste Disposal Auth.*, 576 S.W.2d 773, 779 (Tex. 1978) (holding that article XI, section 9 extends to property held by government agencies).

It is clear from the record before us in this case, however, that the Commission has not ordered a "forced sale" of Engelman's water rights or any other of its assets. The language of the Order is not mandatory and does not require Engelman to sell any of its assets, but instead provides that the district is entitled to do so under the express authority of several provisions of the water code. *See* Tex. Water Code Ann. §§ 49.226(a) ("any land or interest in land owned by the district which is found by the board to be surplus and is not needed by the district may be sold"); .2261(1) ("district may purchase, acquire, sell, transfer, lease, or otherwise exchange water or water rights under an agreement . . . that contains terms that are considered advantageous to the district"); 58.183(a)-(b) (district may sell waterpower privileges so long as sale does not interfere with district's obligation to furnish adequate supply of water for purposes for which the district was organized); .184 ("district may sell any surplus district water for use in irrigation or for domestic or commercial uses to any person who owns or uses land in the vicinity of the district or to other districts which include land in the same vicinity").

Ordering paragraph 2 requires only that Engelman adopt "specific measures"—which "may include but are not limited to" the sale of some of the assets identified—in order to generate sufficient revenues to settle the judgment against it. This language assures us that the Commission is not forcing a sale of Engelman's assets in violation of the constitution but is in fact allowing Engelman the discretion to decide which of the available measures can best be employed to satisfy its obligation. As the Commission explained during oral argument, "settling" the judgment could be achieved in several ways, including by restructuring the debt with Shields Brothers or even by

11

collaterally attacking the judgment and having it be declared void and unenforceable.[6] Because the

Order allows Engelman to choose from a range of alternative means to raise revenues in order to

satisfy its debt obligations, we reject Engelman's claim that the Order is "tantamount" to a directive

requiring Engelman to sell its "non-surplus property."[7]

        Nor are we persuaded that the Order requires a forced sale of Engelman's assets in

violation of the water code.  Section 49.153, cited by Engelman for the proposition that the water

code further protects the property of irrigation districts from forced sale, concerns how the board of

---

[6] The viability of these alternatives will be discussed further in response to Engelman's evidentiary challenges to the Order.

With respect to the enforceability issue, Engelman asserts in passing that the underlying judgment is void as a matter of law because it did not waive its governmental immunity in the original suit brought by Shields Brothers.  That issue is not properly before us, nor has it been adequately briefed to this Court.  We express no opinion as to whether the Texas Supreme Court's opinion in *Tooke v. City of Mexia*, 197 S.W.3d 325 (Tex. 2006), a case decided eight years after the supreme court denied review in the underlying suit and the judgment against Engelman became final, has in fact made the debt owed to the Shields Brothers void as a matter of law.  In this case, when Engelman approached the Commission for bankruptcy authorization, Engelman identified the Shields Brothers judgment as its only existing debt obligation.  The issues raised in this appeal are limited to whether the Commission could reasonably have determined that Engelman can, through the full exercise of its rights and powers, satisfy the debt that Engelman claimed to owe.

[7] As evidence that the Commission "concedes" that the Order requires a sale of its non-surplus water rights, Engelman cites testimony from Diego Abrego, a representative for the Commission, who acknowledged that Engelman would have to sell water rights in excess of 244 acre-feet "in order to satisfy the entire debt now."  Engelman suggests that this statement is conclusive evidence that the only way Engelman can satisfy the judgment owed to Shields Brothers is by selling its water rights, making the Order a "de facto" forced sale of this asset.  We disagree. Abrego was merely responding to the question of how many acre-feet of water would have to be sold in order to raise sufficient revenue to pay the judgment at the present time if selling water rights was the only method utilized.  It is clear that under the Order, however, Engelman is not required to sell water rights and that it may employ *any* method at its disposal—either in addition to or in lieu of selling water rights—in order to satisfy its debts.

12

a water district may borrow money on a negotiable or nonnegotiable revenue note and how such a note is to be paid. *See id.* § 49.153(a)-(e). It sets forth the requirement that no obligation incurred by a district "may ever be a charge on the property of the district or on taxes levied or collected by the district." *Id.* § 49.153(b). According to Engelman, section 49.153 "underscores the protection afforded by the Texas Constitution against forcing the sale of district property."

We have no doubt that the constitution contains such a protection. However, section 49.153 of the water code has no bearing on our analysis of whether Engelman is permitted to sell a portion of its assets, including some of its water rights. While it is statutorily entitled to do so, Engelman has not chosen to borrow money on any notes, thereby invoking application of section 49.153. In the event that Engelman elects to borrow money by issuing a negotiable note, one of the several revenue-raising methods identified in the Order, it will have to comply with the requirements of section 49.153. But we can find nothing in the Order concerning Engelman's option to borrow money on a negotiable instrument if it so chooses that is inconsistent with either the water code or article XI of the constitution. We therefore hold that the Order does not require an unconstitutional "forced sale" of Engelman's assets.

### B. Sale of water rights

Also within its first issue, Engelman argues that any sale of its water rights would violate sections 49.226 and 49.2261 of the water code. Section 49.226 requires that, before any land or interest in land owned by an irrigation district may be sold, the district's board must find it to be a "surplus" asset. *Id.* § 49.226. Section 49.2261 provides that a district may "purchase, acquire, sell, transfer, lease, or otherwise exchange water or water rights," so long as the agreement "contains

13

terms that are considered advantageous to the district." *Id.* § 49.2261. Engelman declares that the record in the case establishes that it has no surplus water rights and that "any sale of water rights would not be 'advantageous' to Engelman." Therefore, Engelman argues that the Order is arbitrary, capricious, and an abuse of discretion. This challenge concerns the sufficiency of the evidence supporting the Commission's finding that Engelman has the ability to sell some of its water rights, based on its implied finding that the district has some surplus water rights. As discussed above, we review this issue under a substantial-evidence standard.

As a related matter, Engelman asserts that it has a "continuing duty" to provide 2.5 acre-feet per irrigable acre of land to its irrigators under the case adjudicating water rights in the Rio Grande Valley, *State v. Hidalgo County Water Control & Improvement Dist. No. 18*, 443 S.W.2d 728 (Tex. Civ. App.—Corpus Christi 1969, writ ref'd n.r.e.). Engelman had argued before the ALJ, as it does now on appeal, that the evidence of Engelman's ability to sell water rights must be considered in light of this duty to provide a minimum of 2.5 acre-feet per irrigable acre. Because Engelman's characterization of much of the evidence relies on its assumption that the district has such a duty, we must first address whether this was indeed the holding of the *Hidalgo County* case.

Both the Commission and Shields Brothers maintain that Engelman has misconstrued *Hidalgo County* by asserting that the case imposes an obligation on the district to provide a minimum level of water to each irrigable acre within its boundaries. On the contrary, they argue, the court of appeals determined that 2.5 acre-feet is the *maximum* amount of water that an irrigation district may provide per acre, based on the unambiguous language of the opinion. Moreover, asserts Shields Brothers, Engelman had taken a directly contrary position in the underlying litigation giving

14

rise to the judgment now at issue by asserting that it had no duty to provide water to the irrigators in its district.

*Hidalgo County*, commonly referred to as the Valley Water Case, was a massive adjudication brought by the State in 1956 to determine rights to the use of the United States's share of the waters of the Rio Grande. *See Hidalgo County*, 443 S.W.2d at 729; *see also Texas Water Rights Comm'n v. Crow Iron Works*, 582 S.W.2d 768, 769 (Tex. 1979). The case involved approximately 3,000 named defendants and 850,000 acres of land. The Corpus Christi Court of Appeals exercised jurisdiction over all of these claims, affirming in part the district court's creation of a class of "equitable" water rights holders made up of people "who have been making a good faith use of the waters of the Rio Grande for irrigation purposes prior to the institution of this suit."[8] *Hidalgo County*, 443 S.W.2d at 749. These equitable rights, termed by the court of appeals as "Class B" irrigation rights, were distinguished from the legal or "Class A" rights held by those who acquired their rights "by virtue of having complied with the appropriation statutes of the State or those whose rights have been recognized by the State." *Id.* at 748. "Class A" rights include those possessed by the statutorily created water control and improvement districts, such as Engelman's predecessor, Hidalgo County Irrigation District No. 6.

In upholding the district court's creation of a weighted priority system, the court of appeals determined that there was sufficient evidence to support the trial court's finding "that the

---

[8] More recently, the Texas Supreme Court emphasized that the recognition of water rights by judicial decree was possible "only on the unprecedented facts of that case," holding that *Hidalgo County* "is limited to those facts, and cannot again be used as authority for the equitable creation of water rights." *In re Adjudication of Water Rights of the Brazos III Segment of the Brazos River Basin*, 746 S.W.2d 207, 210 (Tex. 1988).

amount of water which can be applied to beneficial use for agricultural purposes on the lands involved in this litigation is a maximum of 2.5 acre feet per acre per annum." It is this language that gives rise to the parties' dispute as to whether Engelman is currently under an obligation to supply at least 2.5 acre-feet of water to each irrigable acre within its boundaries. The ALJ agreed with the Commission and Shields Brothers that "nothing in the . . . opinion indicates that an irrigation district has a 'legal duty' to provide 2.5 [acre-feet] per irrigable acre," citing expert testimony that such a duty has not been recognized or enforced—either by Engelman or by any other irrigation district—since the case was decided.[9] Nor has the Texas Supreme Court ever characterized *Hidalgo County* as having created a duty to provide at least 2.5 acre-feet per acre; rather, as it explained in *Crow Iron Works*, what was created was a two-tiered system wherein both classes "are entitled to an allotment of *up to 2.5 acre-feet* per acre, but water is credited to Class A rights at a 70% faster rate than it is credited to Class B rights." 582 S.W.2d at 770 (emphasis added).

We think it is clear that *Hidalgo County* does not speak to a "continuing legal duty" on the part of Engelman or any other irrigation district to provide 2.5 acre-feet per acre to its irrigators. The issue for determination in that case was whether the irrigators described as "Class B"

---

[9] Barry E. Jones, Engelman's own water law expert, acknowledged that the amount was a "maximum" that an irrigation district would ever have to provide and that there has "never" been a diversion from the Rio Grande Watermaster that would satisfy the 2.5 acre-foot per acre maximum for all of the irrigation land in the Valley. The watermaster, Carlos Rubinstein, also testified that there has never been a time when all of the irrigation districts met the full authorized water rights of 2.5 acre-feet per irrigable acre. Engelman's obligations to its irrigators, according to Rubinstein, vary based upon the amount of water that the district has in storage, "whatever that equates to on a per-acre basis," depending on how much water Engelman is allocated by the watermaster—which is, in turn, based upon the total amount of water available in the entire system. Rubinstein also testified that, in the past, Engelman had sold water when it did not have 2.5 acre-feet per acre available to distribute to its irrigators.

users had any right to the waters that they had been diverting in good faith, which the court resolved in their favor based on principles of equity and public policy. *Id.* at 744-50. That the court of appeals found the evidence sufficient for the trial court to have concluded that irrigators could divert a "maximum of 2.5 acre feet per acre per annum" is a much more limited holding than Engelman now suggests. The court in *Hidalgo County* imposed no affirmative duty on the districts, but instead recognized that the evidence in that case supported establishing a limit beyond which water could no longer "be applied to beneficial use for agricultural purposes."[10] *Id.* at 747. Having determined that Engelman is under no judicial mandate to supply 2.5 acre-feet per annum to each irrigable acre in its district, we now turn to the question of whether the evidence is sufficient to support the Commission's finding that Engelman could sell "some of its water rights."

The record establishes that in 1971, Engelman was allocated 20,031 acre-feet of Class A water rights in the Valley Water adjudication, based on its having 8,012 irrigable acres within its boundaries at that time.[11] There was further evidence that since 1971, Engelman has had about 427 acres excluded as "nonirrigated property" and another 80 acres redesignated for domestic use

---

[10] As the Corpus Christi court later recognized, although it "affirmed a trial court's judgment that 2 1/2 acre-feet was the maximum beneficial use for water in the 'Valley Water case,'" that decision must be read in light of the "evidence (annual rainfall, the particular type of land being used, etc.) that supported the trial court's judgment." *City of Corpus Christi v. Nueces County Water Control & Improvement Dist. No. 3*, 540 S.W.2d 357, 369 (Tex. App.—Corpus Christi 1976, writ ref'd n.r.e.) (citations omitted).

[11] Expert testimony at the hearing described an "irrigable acre" as an acre within an irrigation district that will potentially use the water allocated to a district in accordance with the district's water rights allocation. Each irrigable acre represents 2.5 acre-feet of water rights. Therefore, in Engelman's case, 8,012 irrigable acres yields 20,031 acre-feet of water rights.

[2.5 acre-feet per irrigable acre x 8,012 irrigable acres = 20,031 acre-feet]

rather than for irrigation, presently leaving Engelman only 7,498 irrigable acres within its district. Nonirrigated lands can be "excluded" from a district pursuant to chapter 49 of the water code if the lands are no longer irrigable, the owners no longer wish to irrigate, or the lands have been subdivided for residential, commercial, or other nonagricultural purposes. *See* Tex. Water Code Ann. § 49.309.[12]

Based on these figures, Diego Abrego, leader of the Commission's utility and district oversight team, testified that Engelman has a surplus of water rights. He explained that while Engelman has had the total number of irrigable acres within its boundaries decline since 1971, it has had no corresponding decrease in the amount of water rights it owns. Thus, Engelman's water rights are still based on the 8,012-acre allocation, even though the district currently has only "about 7,500 irrigable acres" within its boundaries. Abrego therefore concluded that Engelman could sell about 500 water rights (1,250 acre-feet), a reduction of 6.24% of its total water rights, without "impair[ing] Engelman's ability to continue providing water to meet its obligations." Carlos Rubinstein, the Rio Grande Watermaster, also testified that, to the extent Engelman has irrigable land "that is less than that authorized by their Certificate of Adjudication," the district has excess water rights. In addition, Barry E. Jones, former counsel for Engelman who testified for the district as a water law expert, stated that Engelman currently has a "slight surplus" of water rights.

---

[12] Property that is excluded from an irrigation district is no longer part of the district and is not entitled to water services; in general, once a property is excluded the landowner has no further liability to the district for future taxes, assessments, or other charges. *See* Tex. Water Code Ann. § 49.312 (West 2000).

The Commission also offered evidence that Engelman is not required to provide irrigation water to all of the irrigable acres within its district boundaries. Abrego stated that an irrigation district is not obligated by any law to provide water to irrigators who have not paid their yearly assessments and that the current level of delinquent assessments owed to Engelman represents about 500 irrigable acres. In practice, Abrego concluded, Engelman only has an obligation to provide water to "about 7,025 irrigable acres" of the 7,498 irrigable acres within its district boundaries.

Abrego's testimony that Engelman's irrigable acreage has been reduced by approximately 500 acres since 1971 was undisputed. However, Engelman did assert at the hearing that it has a duty to make allocations to the excluded acreage Abrego referred to because of its obligation to provide water to municipalities, in particular, to the North Alamo Water Supply Corporation.[13] Under the water code, a municipality or water supply corporation that serves excluded lands with potable water may ask a district to convert the excluded land's proportionate share of irrigation-water allocation from irrigation use to municipal use. *See id.* §§ 49.314, 51.756. To do so requires the approval of the Commission. *Id.* In response, the Commission argued that it had not approved Engelman's application to convert water for municipal use and, therefore,

---

[13] Engelman also argued before the ALJ that it was contractually required to provide "push water" to municipalities during times of drought. "Push water" refers to the water that municipalities can purchase from irrigation districts where there is a water shortage. Because the majority of the municipalities are serviced by the same distribution canals that the irrigation districts use, municipalities might be unable to access their water during a drought when there are insufficient flows to move water through the system. Thus, push water becomes necessary "to charge the canal to make sure that in the end the municipal water that is to be delivered to the city actually gets delivered." Engelman does not renew this argument on appeal, however.

19

Engelman has neither a duty nor the authority to provide water to the excluded lands for municipal use.

Engelman also challenged the Commission's evidence that it has surplus water as a result of some farmers' failure to pay their yearly assessments. Andy Scott, a member of Engelman's Board of Directors, testified that the lands owned by irrigators who were delinquent in paying their assessments could not be considered among the district's surplusage. Scott stated that when farmers do not pay their yearly assessments to the district, this does not "free up" water for Engelman to sell; rather, Engelman's policy was to reallocate that water to supplement the allocations to irrigators who had paid their yearly assessments. Scott also testified that, in practice, there has been no "surplus of water" because of drought conditions in the Valley.

Other witnesses also testified that there is currently a water shortage in the region and that the Rio Grande Valley has experienced intermittent drought conditions, particularly during the mid-1990s. Max Phillips, general manager of the neighboring Delta Lake Irrigation District, stated that to his knowledge, there have not been sufficient levels of water for any irrigation district to provide the maximum allocation of water to its customers. He also testified that it was not Delta Lake's policy to take away water from the accounts of farmers who are delinquent in the payment of their yearly assessments. Instead, the water in those accounts remains available in the event that the delinquent assessments are paid.

On this record, the ALJ determined that Engelman has "some excess water rights" in the amount of 1,286 acre-feet, a figure calculated by subtracting the current number of irrigable acres from the amount existing in Engelman's district when its rights were adjudicated in 1971 and

20

multiplying that acreage by 2.5 acre-feet per acre.[14]   As a result, the ALJ concluded and the Commission agreed that Engelman could sell some of its surplus water rights in accordance with section 49.226 of the water code.

In light of all of the evidence in the record, we hold that it was reasonable for the Commission to have adopted the ALJ's finding that Engelman could sell some of its water rights. The evidence that Engelman has a 1,286-acre-foot surplus of water rights beyond what its current irrigable acreage entitles it to have was undisputed.  Engelman's only argument in response, that it has a duty to provide water to its excluded acreage, must fail because the Commission established that Engelman has no such obligation unless and until the Commission approves Engelman's application to convert water for that purpose.  The Commission has not done so, and there was no evidence presented that the Commission intends to approve the conversion.  While we think that Abrego's and Scott's testimony concerning surplusage resulting from delinquent assessments relates more to the issue of whether water is presently available for allocation than whether Engelman has surplus water rights, it is clear that the ALJ did not rely on this evidence in calculating the 1,286-acre-foot surplusage figure.

Nor is the evidence that the Lower Rio Grande Valley has experienced droughts in recent years probative of whether Engelman has a surplus of water rights.  Engelman maintains that the "sale of water rights will only make a bad situation worse and will further reduce the amount of water allocations to Engelman."  Essentially, Engelman argues that there is no way that a sale of

---

[14] 20,031 acre-feet – [(2.5 acre-feet per irrigable acre) x 7,498 irrigable acres] = 1,286 acre-feet

21

water rights could ever be "advantageous," as is required under section 49.2261 of the water code, because the "sale of water rights would destroy its ability to perform its legal obligation to deliver irrigation water." According to Engelman, the record is "completely devoid of evidence" that it would not be materially and adversely affected by the permanent loss of future water allocations as the result of the sale of its water rights.

In so arguing, Engelman misconstrues the requirement contained in section 49.2261. Having reviewed this issue of statutory construction under our de novo standard, we agree with the ALJ that this provision of the water code requires only that the terms of the contract be advantageous to the district; in other words, Engelman must receive a "fair price" for the rights its sells.[15] Section 49.2261 provides that a district may

> purchase, acquire, sell, transfer, lease, or otherwise exchange water or water rights under an agreement between the district and a person or entity that contains terms that are considered advantageous to the district.

Id. § 49.2261(1). It is clear from the plain language of the statute that the word "advantageous" refers only to the terms of the agreement under which a district acquires or sells water rights. This language is not prohibitory, precluding "any sale of water rights" in the event that a district determines that selling an asset would not be advantageous to it. Instead, the language is permissive, granting a district the authority to buy and sell assets, provided that the terms of the exchange are

---

[15] The ALJ also noted that, "even during periods of water shortage," Engelman had previously sold 3,064 acre-feet of its original certificated water rights.

advantageous to the district.[16]  The statute does not mean, as Engelman suggests, that any sale of water rights would violate the water code because there was testimony that the Valley is experiencing a water shortage and drought conditions.  On the contrary, regardless of whether a water shortage exists, Engelman has the capacity to enter into an agreement that contains terms that are advantageous to it.  In fact, there was evidence that *because* of drought conditions, Engelman could fetch an even higher price for the sale of its Class A irrigation water rights, ensuring that a sale of six percent of its water rights would be advantageous and profitable to the district.

There was extensive testimony regarding the market value of Engelman's Class A water rights, including Shields Brothers's estimation that, due to increased demand in recent years, the value of an irrigation water right is $2,000 per acre-foot.[17]  We conclude that the evidence supports the ALJ's determination that a contract to sell some of Engelman's water rights for a price of at least $1,200 to $1,500 per acre-foot would be "advantageous" to the district in accordance with section 49.2261.  Furthermore, contrary to Engelman's assertion, the record does contain testimony that a reduction of 6.24% of Engelman's water rights would not materially affect the District's ability to fulfill its statutory obligation to provide water to irrigators.  This evidence demonstrates that there was a reasonable basis for the Commission's determination that Engelman could sell some of its water rights.  Under our substantial-evidence review, we hold that the Commission did not err in making this finding.

---

[16] "Advantageous" is defined as "giving an advantage; favorable." Merriam-Webster Online Dictionary (www.m-w.com/dictionary/advantageous) (last visited Mar. 21, 2008).

[17] Jesus Flores, a member of Engelman's Board of Directors, agreed that Engelman's water rights could be worth as much as $2,000 per acre-foot.

C.	*Bankruptcy-authorization rule*

Engelman next asserts that the Commission violated its own bankruptcy-authorization rule in denying the district's application to proceed in bankruptcy. *See* 30 Tex. Admin. Code § 293.88(a)(6) (2005). According to Engelman, the Commission impermissibly found that "Engelman should sell water rights and other non-surplus property." Engelman argues that this finding was an abuse of discretion because the bankruptcy-authorization rule only permits the Commission to consider revenues that are generated from a water district's imposition of taxes and fees, not from funds generated by selling its property. Therefore, Engelman reasons, the Commission considered an "illegal method" of raising money when it determined that the district could sell some of its non-surplus assets.

Section 293.88(a) lists the items that a district requesting bankruptcy authorization from the Commission must include in its application. *Id.* §§ 293.88(a)(1)-(11). Along with several other documents, a district must provide a

> complete analysis of the tax rate, user fees or other charges or sources of revenues that the district may lawfully impose that would be necessary in order for the district to meet its debts and obligations as they become due and the impact of such taxes and fees upon taxpayers and users within the district.

*Id.* § (a)(6). According to the Commission, Engelman "ignores the fact that § 293.88 requires a district to provide more than tax and fee information." For example, the district must also furnish the Commission with a description of the reasons that the projections and assumptions used in connection with the most recent issue of bonds were not realized, as well as a complete analysis of the reasons that the district cannot reasonably expect to meet its debts and other obligations as they

24

mature. *Id.* §§ (a)(5), (7). In a final catch-all provision, the rule requires that a district must submit "such other information" that the Commission "considers material to a determination of whether authorization to proceed in bankruptcy should be granted." *Id.* § (a)(11).

The Commission's interpretation of its own rule is entitled to deference, and we will reverse it only when the Commission fails to follow the clear, unambiguous language of its regulation. *See Power Res. Group, Inc.*, 73 S.W.3d at 357. The rule at issue here, according to its plain language, lists the categories of information that a district must supply to the Commission when the district seeks authorization to proceed in bankruptcy. The scope of this inquiry, as the Commission points out, is broad. Furthermore, the rule concerns the information that the Commission should consider in order to determine whether a district can meet its debts and other financial obligations through the full exercise of its rights and powers; it does not discuss the actual measures that the district will have to implement if the Commission determines that the district's application should be denied. Nothing in the rule speaks to which specific measures the Commission may order the district to implement, and nothing prohibits the Commission from considering a particular measure of generating revenue. We conclude that the Commission did not abuse its discretion in determining that it could consider the revenue-generating methods that are contained in the Order, not limited to the imposition of taxes, user fees, and other charges.

Having determined that the Order does not violate the constitution and laws of Texas and that the evidence supports the Commission's finding that Engelman could sell some of its water rights, we overrule Engelman's first point of error.

*Borrowing money*

In its second issue, Engelman asserts that the Commission erred in determining that Engelman could borrow money to satisfy the Shields Brothers debt because there is no provision allowing a district to borrow money for the purpose of satisfying a private judgment creditor.

Under section 58.391 of the water code, the board of an irrigation district

> may declare that funds are not available to meet lawfully authorized obligations of the district, thereby creating an existing emergency, and may borrow money at a rate of not more than 10 percent a year on notes of the district to pay obligations.

Tex. Water Code Ann. § 58.391. The Commission points out that the plain language of the water code thus allows Engelman, if it so chooses, to pay a lawful judgment entered against it by borrowing money under the water code. While giving deference to the Commission's reasonable interpretation of this provision, we further note that Engelman's interpretation would lead to the absurd result of requiring the legislature to specifically set out every "lawfully authorized obligation" to which a district may apply revenues generated from borrowing money. We do not think that the water code must expressly authorize a district to borrow money to pay a private judgment creditor, which is included within the obligations already contemplated by the statute.

Engelman argues, however, that even if it could legally borrow money to pay the Shields Brothers judgment, "there is no evidence in the record" upon which the Commission could have determined that Engelman could repay the debt because Engelman does not have the ability to pay long-term debt. We disagree. Diego Abrego testified that sections 49.152 and 49.153 of the water code allow a district to borrow money "for any corporate purpose" on a three-year negotiable

26

note without requiring the district's board to declare an emergency, and that with Commission approval, the term may be extended beyond three years.[18] Nothing in the record contradicts this evidence or suggests that the Commission would refuse to approve a revenue note beyond three years if Engelman sought such approval.

We overrule Engelman's second point of error.

***Water assessments and charges***

In its third issue, Engelman argues that there is no evidence to support the Commission's finding that Engelman can increase its water assessments and charges "by an amount sufficient to satisfy the judgment." This argument is premised on the assumption that each "specific measure" identified in the Order as a means by which Engelman could raise revenue must, in and of itself, be sufficient to satisfy the entire obligation. This presupposition is wholly unsupported by the governing statutes and rules of the Commission, and Engelman points us to no authority that would support this contention. Engelman's interpretation is also contradictory to the language of the Commission's bankruptcy-authorization rule, which refers to the specific "measures," not one single measure, that the district shall implement. *See* 30 Tex. Admin. Code § 293.88. In addition, we hold that the evidence is sufficient to support the Commission's determination that Engelman could increase its water assessments and charges.

---

[18] "The district may issue bonds, notes, or other obligations to borrow money for any corporate purpose or combination of corporate purposes only in compliance with the methods and procedures provided by this chapter or by other applicable law." Tex. Water Code Ann. § 49.152 (West 2005). A district may not execute a note for a term longer than three years unless the Commission issues an order approving the note. *Id.* § 49.153(c).

27

As mentioned above, irrigators must pay a yearly assessment to the irrigation district in order to receive water. The assessment is determined by the district's board of directors. *See* Tex. Water Code Ann. § 58.301. Commission experts testified that, if an irrigator is delinquent in paying his assessments, the district is not obligated to provide him with water.

The record shows that in 2000, the average flat tax rate charged by all of the irrigation districts in the Rio Grande Valley was $11.80 per acre, while Engelman charged only $9.00 per acre. Two of Engelman's directors, Urbano Anzaldua and Reynaldo Maldonado, testified that the flat tax rate could be increased without significantly impacting their own operations as farmers in the district.[19] Abrego testified for the Commission that Engelman could implement a "marginal increase" in their assessment rates.

The ALJ determined that Anzaldua's and Maldonado's testimony was sufficient evidence to support a finding that increases in assessments and water charges would be an appropriate "specific measure" that the district could adopt. In the absence of evidence to the contrary, we agree with the ALJ and, as previously noted, we reject Engelman's position that each separate revenue-generating measure must be capable of satisfying the entire judgment in full. Rather, as the ALJ and Commission reasonably determined based on the evidence in the record, an "increase[] in assessments such as the flat tax rate . . . is one such specific measure."

We overrule Engelman's third point of error.

---

[19] Members of an irrigation district's board of directors are commonly property owners and irrigators themselves, according to the testimony before the ALJ.

28

*"Specific measures"*

In its fourth issue, Engelman complains that the Order is "procedurally flawed" because it fails to comply with the Commission's bankruptcy-authorization rule, which requires the Commission to order Engelman "to adopt specific measures" in order to generate revenues sufficient to pay its debts as they mature. *See* 30 Tex. Admin. Code § 293.88(d). Instead, according to Engelman, the Commission "only offered general suggestions and then leaves it to Engelman" to decide which measures to adopt.

Giving proper deference to the Commission's interpretation of its own rule, we find no inconsistency between the mandate of section 293.88(d) and the ordering paragraphs at issue. The Order states that specific measures are to be adopted, identifies several specific measures that the evidence shows Engelman can in fact utilize, and describes the supervisory role that the Commission will assume in ensuring that the specific measures are implemented. Because the Commission's interpretation is reasonable, we will defer to the Commission's decision to make it Engelman's responsibility—not the Commission's—to decide which measures should be implemented. *See Public Util. Comm'n*, 809 S.W.2d at 207; *Lone Star Salt Water Disposal Co.*, 800 S.W.2d at 929. Engelman's fourth issue is overruled.

*"No evidence"*

Engelman's fifth issue, in its entirety, states:

> There was no evidence in the record upon which the [Commission] could find that Engelman can reasonably meet its debt obligations as they mature. Engelman incorporated herein its arguments and authorities set out in Issue Nos. 1-4 above

29

herein.  For all of the foregoing reasons, the [Commission] erred in denying 'Engelman's Petition for Authorization to Proceed in Federal Bankruptcy.'

Because this issue is duplicative of the issues we have previously addressed and overruled, we also overrule Engelman's fifth issue.

## CONCLUSION

Having found that the trial court did not err in finding that the Commission's Order denying Engelman's application to proceed in bankruptcy is lawful and reasonably supported by evidence, we affirm the judgment of the trial court.

_____

Diane Henson, Justice

Before Chief Justice Law, Justices Waldrop and Henson

Affirmed

Filed:   April 10, 2008

30